**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MOLLIE HOSEA,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 04-0605-WS-C** |
| | ) | |
| **JESSE LANGLEY,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the following motions: the Motion for Summary Judgment filed by defendants Rogers and Fuller (doc. 92); the Motion for Summary Judgment filed by defendants Langley, Reese, Jones and Lawrence (doc. 81); Defendants' Joint Motion to Strike Declarations (doc. 110); Joint Motion to Strike Plaintiffs' Exhibit C (doc. 112); Joint Motion to Strike Plaintiffs' Exhibit F (doc. 113); and Joint Motion to Strike Mollie Hosea Declaration (doc. 114). The Motions have been briefed and are now ripe for disposition.

**I.      Overview of the Case.**

This multiparty action, involving three plaintiffs and nine remaining defendants, was filed in this District Court on September 20, 2004.[1] The plaintiffs are three sisters, Mollie Hosea, Fleta Mae Hosea and Floyd Ann Hosea (collectively, the "Hoseas" or "plaintiffs"), who range in age from 72 to 84. (M. Hosea Dep., at 8, 10; Sheriff's Defendants' Exh. O-R.)[2] The Hoseas, who are African-American, resided on family property (the "Property") in Dixons Mill, which is located in Marengo County, Alabama, until they were evicted pursuant to a state court order in January 2002. Eight months later, in September 2002, plaintiffs returned to the

---

[1]      Plaintiffs' claims against two other defendants, William E. Goodwin and Nedra E. Goodwin, were dismissed on December 12, 2005 pursuant to a stipulation of dismissal entered into between the Goodwins and plaintiffs. (*See* doc. 107.)

[2]      Mollie Hosea testified in her deposition that her date of birth was July 1, 1942 (M. Hosea Dep., at 8), but arrest and court records reflect that her actual date of birth was July 1, 1933. (Sheriff's Defendants' Exh. O, P.)

Property, where they allege that deputies from the Marengo County Sheriff's Department detained them while other individuals burned, destroyed, and stole the Hoseas' personal property.[3]  Presently, plaintiffs apparently continue to reside on the Property, from which they were ejected four years ago, in contravention of court orders and without the permission of the current owners.  (*See* doc. 111, at Exh. D; M. Hosea Dep., at 139-40, 152, 154.)

This lawsuit arises from those events.  Named defendants include Marengo County Sheriff Jessie Langley and Deputies Tommie Reese, Bryant Jones and Lee Lawrence (collectively, "Sheriff's Defendants"), as well as Leroy Rogers, Larry Fuller, Jimmy McDonald, Mike E. Ledkins and Judy Ledkins (collectively, "defendants").  Count I of the Complaint alleges that defendants deprived plaintiffs of liberty and property, under color of law and without due process, in violation of 42 U.S.C. § 1983, including deprivation of plaintiffs' rights to "[f]reedom from illegal seizure of [their] property," "[f]reedom from illegal detentions," "[f]reedom from humiliation and intimidation and harassment," freedom from deprivation of liberty and property without due process of law, "[e]qual protection of the law," "[f]reedom from invasion of privacy," and the right to "[e]arn a living without illegal interference."  (Complaint, ¶ 22.)  Count II alleges that defendants entered into a conspiracy to deny plaintiffs' constitutional rights, including the right "to own, inherit and hold property," the right "to fair and equitable trial," the right "not to be deprived of liberty and property without due process of law, guaranteed by the 5th and 14th Amendments," "the rights reserved or retained under the 9th and 10th Amendment[s]," and the right "to equal protection of the laws guaranteed under the 14th Amendment" (Complaint, ¶ 28), all in violation of 42 U.S.C. §§ 1983 and 1985.  Count III charges defendants with denying plaintiffs' right to peaceful ownership of their land because of their race, in violation of 42 U.S.C. § 1982.  Count IV maintains that in January 2002 defendants entered into an agreement or mutual understanding to interfere with plaintiffs' liberty and to

---

[3]     According to the Complaint, defendants stole substantial personal property belonging to the Hoseas, including "280 cows, 200 ducks, 200 chickens, 30 donkeys, 140 goats, 8 hogs, two roll[s] of hog wire, five wash pots, 6 cars, gas fryer, trimmer, hoes, syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, two antique machines, three iron bed[s], three dresser[s], four armoires, six big post bed[s], clothes, and riding lawn mower." (Complaint, ¶ 18.)  The Hoseas allege that this personal property was valued in excess of $750,000.  (*Id.*, ¶¶ 41, 46.)

deny them equal protection of the laws, in violation of 42 U.S.C. §§ 1983 and 1985.  Finally, Counts V and VI are apparently duplicative state-law causes of action charging defendants with conversion and theft of plaintiffs' personal property.

All 11 originally named defendants filed motions to dismiss on various overlapping grounds, including statute of limitations, sovereign immunity, res judicata, and insufficiency of pleading under Rule 8(a)(2).  On February 10, 2005, the undersigned entered an Order (doc. 39) denying those motions, with one exception.  The Sheriff's Defendants' motion was granted in part, such that plaintiffs' state law claims (Counts V and VI) against those defendants were dismissed on sovereign immunity grounds and their federal claims (Counts I - IV) against those defendants in their official capacities were dismissed on Eleventh Amendment immunity grounds.  Pursuant to the February 10 Order, the Hoseas' only surviving claims against the Sheriff's Defendants are Counts I through IV in those defendants' individual capacities.

At the close of discovery, eight of the 11 defendants filed motions for summary judgment.[4]  In briefing these motions, defendants submitted written objections to no fewer than seven of plaintiffs' exhibits.  Because any evaluation of the merits arguments necessarily hinges on the type and nature of facts in the record, and because the motions to strike call into question which facts are properly before the Court, resolution of these motions to strike is the appropriate analytical starting point.  Only after the dust from those motions has settled can the Court ascertain the contents of the record and weigh the parties' competing Rule 56 arguments.

## II.    Motions to Strike.

Defendants' Motions to Strike (docs. 110, 112, 113, 114) challenge the propriety of four categories of exhibits submitted by plaintiffs.  First, defendants submit that several witness declarations should be stricken because, *inter alia*, plaintiffs never identified such witnesses in their initial disclosures or in any amendments to same.  Second, defendants assert that photographs appended to plaintiffs' brief must be stricken because no foundation or other indicia

---

[4]    Shortly thereafter, plaintiffs stipulated to the dismissal of all claims against two of those defendants, the Goodwins, leaving only six defendants' Rule 56 motions still in play. Three other named defendants, Jimmy McDonald, Mike Ledkins, and Judy Ledkins, all of whom are represented by counsel, elected not to file dispositive motions or otherwise to participate in the summary judgment process.

of authenticity has been presented.  Third, defendants challenge the propriety of a newspaper article designated by plaintiffs as an exhibit.  Fourth, defendants request that the declaration of Mollie Hosea be stricken because it contradicts her previous sworn testimony and suffers from minor technical defects.  Plaintiffs have filed an omnibus Opposition (doc. 116) to these various Motions to Strike.[5]

### A.  Declarations of Ford, B. Figgers, J. Figgers, and Grayson.

As part of their submission in opposition to the Rule 56 motions, the Hoseas proffered the Declarations of Phil Ford, Bertha Figgers, Jimmy Figgers and Clyde Grayson.  (*See* doc. 104, Exh. A, B, D, E.)  Ford and the Figgerses offer averments as to their first-hand observations of the pillaging of the Hoseas' property and the presence of certain Sheriff's Defendants at the scene, while Grayson primarily declares his knowledge of various items of personal property owned by the Hoseas prior to the events at issue.

#### 1.  Procedural Posture.

In their first Joint Motion to Strike (doc. 110), defendants argue that none of these declarations are permissible because plaintiffs did not disclose these witnesses in accordance with the Federal Rules of Civil Procedure.  The record confirms that Plaintiffs' Initial Disclosures dated April 22, 2005 did not mention any of these four individuals as prospective witnesses.  (Doc. 111, at Exh. A.)  In response to interrogatories propounded by defendants Rogers and Fuller on May 23, 2005, requesting identification of any and all persons with knowledge about Rogers' and Fuller's actions giving rise to plaintiffs' claims against them, plaintiffs did not provide a single name.  (*Id.* at Exh. C, D.)[6]

---

[5]     The parties have felled more trees and spilled more ink in litigating the Motions to Strike than many litigants in federal court devote to dispositive motions altogether.  In total, the parties have submitted 43 pages of briefing and more than a dozen exhibits, just in reference to the Motions to Strike.  It is regrettable that counsel have opted to spend so extensively of their clients' resources, and to tie up so much of the Court's time, quarreling in a veritable battle royale over collateral matters that likely could have been obviated at an earlier date and/or resolved informally without judicial involvement.

[6]     Defense counsel admits, however, that in answers to interrogatories posed by the Goodwin defendants, plaintiffs identified both "Phil Forbes" and "Jimmy Figures" as prospective witnesses.  (*Id.* at 6, 7 & Exh. K.)  Unfortunately, despite furnishing the Court with

But it would be unfair and incorrect to suggest that plaintiffs never notified defendants of the existence of any of these witnesses during the discovery process.  The operative Rule 16(b) Scheduling Order (doc. 49) set a discovery deadline of October 5, 2005.  During the deposition of Fleta Mae Hosea on September 19, 2005, she mentioned the name "Phil Ford."  The Sheriff's Defendants' counsel promptly asked, "Is he a witness in this case?" to which plaintiff's counsel responded, "Yeah."  (*Id.* at Exh. E.)[7]  In a letter to plaintiffs' counsel dated September 23, 2005, the Sheriff's Defendants' counsel requested contact information for "Phil Forbes (or Ford)" and "Jimmy Figures," among others, so that he could take their depositions.  (*Id.* at Exh. F.)  When plaintiffs failed to respond, the Sheriff's Defendants' attorney sent another letter to plaintiffs' counsel on September 27, 2005, reiterating his request and proposing that the depositions of Ford and Jimmy Figgers be taken on October 3, 2005.  (*Id.* at Exh. G.)  Again, plaintiffs did not respond.  Rather than filing a motion to compel or independently investigating the whereabouts of these witnesses, defendants appear simply to have abandoned the issue and not to have taken any follow-up measures prior to the close of discovery.

In the late evening hours of October 2, 2005, plaintiffs' counsel faxed Amended Initial

---

11 exhibits in support of their Motion to Strike, defendants neglected to submit those interrogatory responses; therefore, the Court does not know the precise date that such information was produced to defendants.  Likewise, defendants muddy the waters by protesting that "[n]one of these four persons were ever disclosed in answers to any Interrogatories" (doc. 111, at 9) when they know this not to be true.  That Ford's and Jimmy Figgers' last names may have been slightly misspelled in discovery responses cannot logically support a conclusion that these witnesses were never disclosed in discovery responses.

[7]     As if this indication was not sufficient to place defendants on notice of Ford's potential significance as a witness, Mollie Hosea testified on September 28, 2005 that Ford was the only person other than Sheriff's Deputies and Michael Ledkins who was present when plaintiffs were evicted from their home, and that Ford transported plaintiffs to his sister's home thereafter.  (M. Hosea Dep., at 22, 24.)  Mollie's deposition testimony also placed Ford squarely in the center of the drama at the time of the burning on September 24, 2002, and plaintiffs' arrest of September 18, 2002.  (*Id.* at 65, 69-72, 159.)  Given the recurrence of Ford's name in discovery at virtually every significant factual juncture, it is disingenuous for defendants to suggest that they lacked timely notice of his status as a prospective witness for plaintiffs.

Disclosures to defense counsel.[8]  These Amended Disclosures identified some 23 individuals likely to have discoverable information, including all 11 named defendants, as well as Clyde Grayson (with the notation "he has first hand knowledge of property owned by the defendant") and Jimmy Figgers (with the explanation "he knows about the property owned by the plaintiff. He also saw the burn, destruction and taking of the property."). (*Id.* at Exh. H.)  Neither Bertha Figgers nor Phil Ford was mentioned in the Amended Disclosures.  Rather than taking immediate action to arrange for depositions of these witnesses, or to petition the Court for a short extension of the discovery deadline to enable them to do so, defense counsel simply adopted a defeatist approach, announcing on October 3, 2005 (before discovery had even closed) that "we have been precluded from discovery concerning those witnesses, and will object to any testimony from them."  (*Id.* at Exh. I.)[9]

        In the early afternoon of October 4, 2005, plaintiffs faxed revised amended disclosures to defense counsel, this time adding the name Phil Ford and providing addresses for Clyde Grayson, Jimmy Figgers and Ford, as well as for other named witnesses.  (*Id.* at Exh. J.)  Again,

------------

        [8]    Defense counsel suggests that the certificate of service accompanying the Amended Disclosures evinces impropriety by plaintiffs' counsel.  In particular, defense counsel points out that the certificate is dated June 6, 2005, but that this date has been stricken and replaced with a handwritten date of October 2, 2005.  Based on this fact, defense counsel speculates that plaintiffs' counsel may have withheld the Amended Disclosures for four months before serving them.  (*See* doc. 111, at 5.)  The Court cannot so find on the basis of such a frail showing.  As counsel are well aware, certificates of service may list inaccurate dates for myriad innocuous reasons.  Had defense counsel wished to pursue this matter, they could have filed an appropriate discovery motion, as to which Magistrate Judge Cassady could have held a hearing to determine what happened.  Having failed to do so, defense counsel cannot rely on speculation and innuendo to attribute nefarious intent to their counterpart attorneys.

        [9]    From the October 3 letter, it appears that defendants' decision not to seek additional time to depose these witnesses was prompted by strategic considerations.  In particular, defendants knew that plaintiffs' counsel desired an extension of the discovery deadline to facilitate the depositions of the defendants.  It would have been incongruous for defense counsel in one breath to ask for an extension of the discovery deadline to allow them to depose plaintiffs' newly named witnesses, while in the next breath opposing plaintiffs' request for extension to depose defendants.  So defense counsel chose to remain silent.  Whatever the wisdom of that strategy may have been, it lends a hollow ring to defense counsel's present cries of unfairness.

-6-

defendants' response was not to attempt to work with plaintiffs to set deposition dates as expeditiously as possible, nor was it to petition the Magistrate Judge for an extension of discovery to enable them to do so; instead, defendants simply adopted the absolutist position that "[w]e intend to object to any use of the witnesses you list." (*Id.* at Exh. K.)  Of course, defendants have now done just that, by objecting to plaintiffs' use of declarations by witnesses Ford, Jimmy Figgers and Grayson (all of whom defendants were aware of prior to the close of discovery), as well as plaintiffs' use of a declaration by witness Bertha Figgers (who apparently had never been identified by plaintiffs as a potential witness prior to the submission of her declaration).[10]

2.     *Legal Standard.*

Under Rule 26(a)(1)(A), Fed.R.Civ.P., a litigant in federal court must provide initial disclosures including "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment, identifying the subjects of the information." *Id.*  The Rule 16(b) Scheduling Order (doc. 49) obligated the parties to exchange initial disclosures on or before April 22, 2005.  By rule, the disclosure obligation is continuing, such that a party must supplement its disclosures "at appropriate intervals ... if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Rule 26(e)(1), Fed.R.Civ.P.[11]  Magistrate Judge Cassady ordered the parties to make Rule 26(e) supplementation "'at appropriate intervals' and

---

[10]     From a timing standpoint, defendants chose to sit on their objections, never presenting them for judicial resolution until the midst of summary judgment.  These proceedings could have been streamlined considerably had defendants articulated timely discovery objections to Judge Cassady, instead of unleashing them *en masse* in the heart of the summary judgment briefing process.

[11]     A parallel supplementation obligation extends to responses to interrogatories, such that a party must seasonably amend such responses "if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Rule 26(e)(2), Fed.R.Civ.P.

'seasonably', but not later than November 4, 2005." (Scheduling Order, ¶ 7.) If a party without substantial justification fails to disclose required information, then that party "is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Rule 37(c)(1); *see also Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) ("it was within the sound discretion of the trial judge to sanction plaintiffs for their failure to disclose by enforcing the unambiguous terms of Rule 37(c)"). In evaluating whether the failure to disclose a witness is harmless, the Eleventh Circuit considers "(1) the importance of the testimony; (2) the reason for the appellant's failure to disclose the witness earlier; and (3) the prejudice to the opposing party if the witness had been allowed to testify." *Bearint ex rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004).

    *3. Discussion.*

    By any yardstick, the chain of events described by the parties relative to disclosure of witnesses is contrary to both the letter and spirit of the Federal Rules of Civil Procedure. But counsel for both sides share fault for this debacle. With respect to plaintiffs' counsel, it is evident that they knew they intended to rely on testimony from Phil Ford, Jimmy Figgers, Bertha Figgers and Clyde Grayson long before they identified these witnesses to defendants via amended disclosures. It is also apparent that plaintiffs' counsel possessed or reasonably could have obtained contact information for these witnesses substantially before such information was furnished to defendants. Discovery in federal court is not a game of hide the ball, and plaintiffs' tactics of ignoring defendants' written inquiries and sending eleventh-hour faxes to provide information that could and should have been furnished weeks or months beforehand are not acceptable. That said, as to several of these witnesses, defense counsel failed to take steps reasonably available to them to secure depositions or statements in a timely manner. Rather than being proactive in attempting to obtain the requisite discovery, defense counsel was content to express indignation at plaintiffs' course of conduct, then sit back and do nothing until these declarations were filed. A witness-by-witness analysis will readily illustrate these failings.

    With respect to Phil Ford, defendants knew about his status as a plaintiffs' witness well before the close of discovery. At Fleta Mae Hosea's deposition on September 19, 2005, the deponent identified Ford by name and plaintiffs' counsel orally confirmed on the record that

Ford was a plaintiffs' witness.[12]  Sometime prior to that date, plaintiffs had identified "Phil Forbes" as a witness in response to written discovery from the Goodwin defendants.  Clearly, then, by no later than several weeks before the close of discovery, defendants were on notice that plaintiffs intended to use Ford as a witness.  Yet defendants did not attempt to locate Ford, although he apparently lives on the Property.  Instead, defense counsel sent two letters to plaintiffs' counsel requesting Ford's address and, when no response was forthcoming, did nothing else.  Defendants likely could have located Ford themselves with a modicum of effort.  They could have called plaintiffs' counsel in good faith to conference about the issue.  They could have filed a motion to compel to force plaintiffs to divulge Ford's address and telephone number.  Instead, they simply bided their time until the sunset of discovery in hopes of excluding Ford's testimony.  The Court finds that, while plaintiffs did not disclose Ford's identity and whereabouts as expeditiously as they should have, this omission was harmless because (a) plaintiffs did reveal Ford's identity weeks before the close of discovery, and (b) defendants failed to avail themselves of procedural and investigative tools reasonably available to them to arrange for Ford's deposition prior to the close of discovery despite ample time for them to do so.  Under these circumstances, Ford's declaration will not be stricken pursuant to Rule 37(c)(1).

The situation with respect to Jimmy Figgers is similar.  Plaintiffs identified him (although apparently with a slight misspelling of his last name as "Figures") in response to the Goodwin interrogatories weeks, or longer, before the close of discovery.  Jimmy Figgers' name was also disclosed (with the same misspelling in the transcript) at Fleta Mae Hosea's deposition on September 19, 2005.  Defendants knew he was a plaintiffs' witness and requested his address from plaintiffs' counsel on multiple occasions before the close of discovery.  Again, when

---

[12]     In light of this clear record supported by their own Exhibit E to document 111, defendants' position that Ford "was not disclosed as a potential witness until the afternoon of October 4, 2005" is demonstrably incorrect and misleading.  (Doc. 117, at 5.)  To the extent that defendants would claim that Ford could not be classified as a potential plaintiffs' witness until his name was listed in amended disclosures, that argument is defeated by the plain language of Rule 26(e)(1), which requires supplementation only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  *Id.*  Here, Ford's identity and witness status had plainly been made known to defendants during the discovery process.  As such, the date of his inclusion in the Amended Disclosures is of no legal significance.

plaintiffs failed to respond with contact information, defendants abandoned the issue.  While defendants would make much of the misspelling of "Figures" rather than "Figgers" in those discovery responses, they offer no indication that this mere scrivener's error had any detrimental impact on their ability to track down or depose Figgers, in large part because it appears they never even attempted to find him.  Once again, the Court finds that plaintiffs' disclosure shortcomings with respect to Jimmy Figgers are harmless for the same reasons as those concerning Ford.  The Jimmy Figgers Declaration will not be stricken.

Clyde Grayson is situated slightly differently than Ford or Jimmy Figgers because his name was not identified in any discovery responses or in any deposition.  The first time defendants had notice of Grayson's status as a witness was on October 2, 2005, when plaintiffs' counsel faxed the Amended Disclosures.  Although plaintiffs' unexplained delay in furnishing Grayson's name to defendants is inexcusable, defendants' response was equally deficient.  Rather than trying to line up a last-minute deposition for Grayson, requesting a brief extension of the discovery deadline to facilitate that deposition, or otherwise working with plaintiffs' counsel to resolve the issue constructively, defense counsel's only response was a brusque vow to object to Grayson's testimony.  Again, there were vehicles readily available that would have permitted defendants to depose Grayson, notwithstanding the late date of his disclosure.  For strategic reasons, defendants chose not to pursue them.  That choice renders the delayed disclosure of Grayson's name harmless, and overcomes defendants' attempt to strike Grayson's declaration pursuant to Rule 37(c)(1).

Last but not least is Bertha Figgers.  The evidence is uncontradicted that plaintiffs never disclosed Bertha Figgers' name (in any spelling configuration) or their intention to call on her as a witness at any time prior to the close of discovery.  Indeed, the record before the Court reveals that the earliest notice defendants ever received that plaintiffs might rely on her as a witness was when plaintiffs electronically filed her declaration in opposition to defendants' Motions for Summary Judgment on December 1, 2005.  Plaintiffs have offered no reasonable explanation for their failure to disclose Bertha Figgers' identity at an earlier date, and defendants will plainly be

prejudiced by plaintiffs' utilization of a surprise witness on summary judgment.[13]  Because plaintiffs never disclosed Bertha Figgers as a prospective witness at any time prior to submitting her summary judgment declaration in December 2005, nearly two months after the close of discovery, and because this omission lacked substantial justification and was not harmless, Bertha Figgers' Declaration (doc. 104, Exh. B) is **stricken** pursuant to Rule 37(c)(1).

Two final issues must be addressed before leaving the topic of the plaintiffs' witnesses' declarations.  First, defendants object that the declarations of Jimmy Figgers and Grayson must be stricken because each states that it was executed "on this the _____ day of August, 2005" without having the date filled in.  (Doc. 111, at 10.)  In the absence of binding authority or an explicit statutory mandate to the contrary, which defendants have not cited, the Court will not strike these declarations for such a trifling technical defect, where the declarations clearly are in substantial compliance with 28 U.S.C. § 1746.[14]  Second, defendants urge the Court to strike statements in the declaration of Phil Ford that "I believe that waste played a part in this matter."

---

[13]     At most, plaintiffs weakly argue that they did not need to disclose Bertha Figgers' name because she was already known to defendant Michael Ledkins because she had conversed with him about goats at one point, and she was already known to the Sheriff's Defendants because she had a conversation with them at the scene of the burning of plaintiffs' property. (Doc. 116, at ¶ 14.)  Nothing in Rule 26(a)(1)(A) states that a party need not identify a prospective witness if the other party has spoken with that witness.  Nothing in Rule 33 says that a party can omit information responsive to an interrogatory if the party thinks the other side might have some knowledge of that information.  The point is that plaintiffs were obliged to inform defendants of witnesses whom they believed had discoverable information on which plaintiffs intended to rely to support their claims.  Plaintiffs knew that Bertha Figgers had such information, yet they neglected to identify her to defendants until nearly 60 days after discovery ended.  That plaintiffs contend this witness had conversed with various defendants at some time in no way excuses them from complying with their discovery obligations.

[14]     On its face, the statute requires that declarations be dated.  Defendants characterize the blank date on the Figgers and Grayson declarations as a fatal defect under § 1746.  The more enlightened view espoused in the case law, and the view embraced by the undersigned here, is that substantial compliance with § 1746 is all that is required, and that enumeration of the month and year is sufficient to constitute substantial compliance.  *See, e.g., Pieszak v. Glendale Adventist Medical Center*, 112 F. Supp.2d 970, 999 (C.D. Cal. 2000).  Defendants cite *Leasehold Expense Recovery, Inc. v. Mothers' Work, Inc.*, 331 F.3d 452, 458 (5th Cir. 2003), in support of their position; however, they furnish an inaccurate citation for that case, which in any event is not inconsistent with the foregoing.

(Doc. 111, at 9.)  The Court has scoured Ford's Declaration in vain for any such statement, so this objection is baseless.

In short, then, the maelstrom of briefing over the status of four witness declarations submitted by plaintiffs stems from two countervailing, equally culpable forces: (a) plaintiffs' failure to adhere to the Federal Rules of Civil Procedure with regard to disclosure of witnesses, and (b) defendants' apparent desire to ensnare plaintiffs in a trap instead of working constructively to resolve discovery issues when they arose.  For the reasons set forth *supra*, the Joint Motion to Strike (doc. 110) is **granted in part** and **denied in part**.  The Joint Motion is **granted** as to the Declaration of Bertha Figgers (doc. 104, Exh. B), and that Declaration is **stricken** pursuant to Rule 37(c)(1), Fed.R.Civ.P.  The Joint Motion is **denied** as to the other three declarations, inasmuch as plaintiffs' disclosure deficiencies relating to Phil Ford, Jimmy Figgers and Clyde Grayson were all harmless.  Those declarations will be considered on summary judgment, and those three witnesses will not be barred on untimely disclosure grounds from testifying on plaintiffs' behalf.[15]

> **B.      Photographs.**

Defendants' second Joint Motion to Strike (doc. 112) takes issue with plaintiffs' Exhibit C, a composite exhibit consisting of nine photographs labeled as "Pictures of Burning of Hoseas' Property."  The photographs do not appear to have been referenced in plaintiffs' opposition to defendants' summary judgment motions, but were appended to that submission without comment.  The exhibit itself consists of photocopies of pictures ranging in quality from grainy and splotchy to indistinguishable.  At best, it is possible to discern one image of a cow, one image of a chicken, and several photos showing buildings or the ruins of what once may have

---

[15]      In reaching this conclusion, the undersigned lends no credence to plaintiffs' counsel's position that their disclosure lapses should be forgiven as the product of plaintiffs' "feeble minds" and their resulting difficulty in recalling names, dates and events.  (Doc. 116, ¶ 10.)  The acuity of plaintiffs' memory is not the issue; rather, defendants' objection focuses on the fact that plaintiffs' <u>counsel</u> at some point determined that Ford, Jimmy Figgers, Bertha Figgers and Clyde Grayson would make good witnesses, but did not immediately disclose their identities to defense counsel.  Plaintiffs' counsel's attempts to shift their own failings in this regard to the "feeble minds" of their clients are ill-advised, at best.

been buildings, some with smoke wafting upwards.[16]

Notwithstanding the largely unilluminating nature of Exhibit C, defendants move to strike it on the grounds that "there has been no foundation laid" and "no evidence presented as to the authenticity of the photographs or as to when or where the pictures were taken." (Motion to Strike (doc. 112), at 1.)[17] Generally, courts ruling on Rule 56 motions may consider only admissible evidence. *See Denney v. City of Albany,* 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in an admissible form.") (citation omitted); *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form."). "Documents must generally be properly authenticated to be considered at summary judgment, unless it is apparent that those documents can be reduced to admissible, authenticated form at trial." *U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1327 n.2 (S.D. Ala. 2003). In opposition to the Motion to Strike, plaintiffs do not proffer affidavits, declarations or other materials purporting to authenticate the photographs; instead, they merely represent to the Court that they "clearly ha[ve] witnesses who can authenticate the photograph[s] at trial, and ha[ve] personal knowledge of the events portrayed in the photographs." (Doc. 116, at ¶ 7.)

Much as the Court is loath to "take a party's word for it" on evidentiary issues, and much

---

[16]    Plaintiffs could have arranged for high-quality color scanning of the subject photographs to render them easier to view when filed electronically. Alternatively, pursuant to this District Court's Administrative Procedure for Filing, Signing and Verifying Documents by Electronic Means, plaintiffs could have requested leave to file Exhibit C via conventional means, thereby giving the Court the benefit of clear, unblemished iterations of these images. Plaintiffs having elected not to adopt either of these procedures, the instant Motion to Strike relates to virtually indistinguishable photocopied photos that, in their present form, are of minimal utility in explicating the events animating this lawsuit.

[17]    For reasons that are not clear, defendants have appended as Exhibit A to their Joint Motion to Strike a copy of Plaintiffs' Amended Initial Disclosures. The Motion does not explain the relevance, if any, of the Amended Initial Disclosures to the relief requested therein. As such, this Exhibit A appears redundant, unnecessary and unhelpful to resolving defendants' objection, and serves merely to clutter the already overburdened court file.

-13-

as the Court is dismayed at plaintiffs' meager showing to bolster the legitimacy and admissibility of the challenged photos, it appears highly likely that plaintiffs will be able to reduce Exhibit C to admissible form at trial with appropriate authentication testimony.  Accordingly, and without ruling on the admissibility of Exhibit C or any constituent part thereof at trial, the Court **overrules** defendants' objection to Exhibit C, and **denies** the Joint Motion to Strike (doc. 112) relating to same.[18]

###    C.    *Newspaper Article.*

As their third Joint Motion to Strike (doc. 113), defendants take aim at Plaintiffs' Exhibit F, an undated newspaper article from *The Democrat-Reporter* describing plaintiffs' arrest for trespassing on September 18 (presumably of the year 2002), defendant Michael Ledkins' efforts to tear down plaintiffs' sheds, mobile homes and other buildings on September 24, and the like. Defendants balk that the article is "hearsay and therefore is inadmissable."  (Joint Motion (doc. 113), at 1.)  In response, plaintiffs explain that they "have witnesses who will testify at trial from their personal knowledge of the events recounted in the newspaper articles [*sic*]" and that plaintiffs themselves "can testify about the events in the newspaper article."  (Doc. 116, at ¶ 4.)

The legal standard applicable to the request to strike Exhibit F is identical to that for Exhibit C, to-wit:  whether that evidence can be reduced to admissible form at trial.  *See, e.g., Church of Scientology Flag Service Organization, Inc. v. City of Clearwater*, 2 F.3d 1514, 1530 & n.11 (11th Cir. 1993) (opining that non-movant appropriately submitted newspaper articles in opposition to motion for summary judgment, even if such articles would have been inadmissible

---

[18]      In so doing, the undersigned attaches no particular value or significance to Exhibit C for summary judgment purposes.  To the contrary, given the murky, low-quality reproduction of the photographs, and plaintiffs' failure to refer to them in their memorandum of law, this Motion to Strike appears to be much ado about nothing.  The Court has no evidence before it to bolster plaintiffs' naked assertion that "one of the photographs shows one of the defendants in the act of burning their property."  (Doc. 116, at ¶ 9.)  After poring over Exhibit C intently, the Court has been unable to discern any visual evidence of one of the defendants caught in the act of torching plaintiffs' belongings, much less the identity of any such defendant. The only visible persons in the photographic composite at Exhibit C appear to be milling around the area or observing the scene, not actively setting buildings ablaze.  Thus, while the Court will consider Exhibit C on summary judgment, its probative value is vanishingly low given the inscrutable nature of the photos and the lack of any evidentiary showing by plaintiffs that might function as an exposition of what they depict.

at trial, where material facts set forth in articles could be produced in admissible form at trial);
*Wilson v. Moore*, 270 F. Supp.2d 1328, 1341 n.11 (N.D. Fla. 2003) (considering newspaper
articles on summary judgment where facts recounted in articles likely could be proven with
admissible evidence at trial).   Contrary to defendants' insistence that Exhibit F's hearsay status
automatically excises it from the ambit of summary judgment consideration (doc. 113, at 1; doc.
117, at 2), the law is clear that "inadmissible hearsay may sometimes be considered by a court
when ruling on a summary judgment motion," provided that such hearsay is reducible to
admissible form at trial.   *Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1135 (11th Cir.
1996); *see also McMillian v. Johnson*, 88 F.3d 1573, 1584-85 (11th Cir. 1996); *Hill v. Manning*,
236 F. Supp.2d 1292, 1297 (M.D. Ala. 2002) ("Upon a motion for summary judgment, the
district court may consider a hearsay statement if the statement could be reduced to admissible
form at trial.").[19]

  Here, there has been no argument from defendants that the events recounted in the
newspaper article could not be proven through admissible evidence at trial.   In fact, given that
many facts articulated in Exhibit F are set forth in quotes from plaintiffs, it appears that plaintiffs
themselves can testify in admissible form as to numerous facts and events recited in Exhibit F.
Plaintiffs have expressly represented to the Court that they and other witnesses will testify at trial
from their personal knowledge concerning events set forth in the article.   (*See* doc. 116, at ¶ 4.)
Defendants have not rebutted these contentions in any meaningful way; rather, they appear to
rest their argument exclusively on a perceived technical defect in Exhibit F (*e.g.*, its presentation
of what is likely admissible evidence in inadmissible form).   In light of the foregoing, the Court
is of the opinion that the defect identified by defendants does not bar this exhibit, as the contents
of Exhibit F should be readily reducible to admissible form at trial.   On that basis, defendants'
objection to Exhibit F is **overruled** and the Joint Motion to Strike Exhibit F (doc. 113) is

---

   [19]  In arguing otherwise, defendants rely on *Club Car, Inc. v. Club Car (Quebec)
Import, Inc.*, 362 F.3d 775 (11th Cir. 2004).   But *Club Car* did not announce a blanket prohibition
on consideration of hearsay on summary judgment, nor did it alter the principles set forth *supra*;
instead, that case is cited only for the unremarkable proposition that "[i]nadmissible hearsay
generally cannot be considered on a motion for summary judgment."   *Id.* at 783.   As the
foregoing authorities make clear, "generally" does not mean "always."

denied.[20]

    **D.**    ***Declaration of Plaintiff Mollie Hosea.***

    In their fourth and final Motion to Strike (doc. 114), defendants contend that the Declaration of Mollie Hosea attached to plaintiffs' opposition brief as Exhibit P should be stricken as a sham because it conflicts with her sworn testimony.[21]  Despite being given an

---

[20]    In reaching this conclusion, two caveats are in order.  First, the undersigned does not reach, and expresses no opinion concerning, the question of whether Exhibit F itself might be admissible at trial.  Second, this ruling in no way endorses plaintiffs' minimal showing in opposition to the Motion to Strike.  Once again, plaintiffs substitute conclusory reassurances for sound evidentiary submissions.  A far more appropriate mode of responding to the Motion would have been to present declarations from witnesses either adopting portions of Exhibit F or articulating their ability to testify from personal knowledge concerning events described in Exhibit F.  The Court denies the Motion to Strike in spite of this weakness in plaintiffs' response.

[21]    Defendants also object to two purported technical shortcomings in the form of the Declaration.  These objections may be dispatched quickly.  Defendants protest that Exhibit P flunks the date requirement of 28 U.S.C. § 1746 because it states only that the declarant executed it on "the _____ day of August, 2005."  For the reasons set forth in Section II.A.3., *supra*, this objection is meritless.  *See, e.g., Pieszak*, 112 F. Supp.2d at 999 (Section 1746 requires only substantial compliance, and enumeration of month and year is sufficient to satisfy date requirement).  Furthermore, defendants harp on the Declaration's failure to "aver that she is competent to testify on the matters stated therein."  (Doc. 114, at 5.)  This objection borders on frivolity.  Mollie Hosea's competency to testify as to the events of September 2002, and the nature and ultimate disposition of plaintiffs' property, is clear from her deposition transcript, during which defense counsel collectively grilled her for hours (spanning more than 200 pages of transcript) concerning this precise subject matter.  If defendants harbored legitimate doubts as to Mollie's competence to testify about these events, they could have pinpointed sections of her deposition transcript evincing such incompetence.  They have not done so.  Besides, careful review of Exhibit P, taken in context, implicitly demonstrates Mollie's competence.  *See generally Markel v. Board of Regents of University of Wisconsin System*, 276 F.3d 906, 912 (7th Cir. 2002) (equating competence and personal knowledge requirements of Rule 56(e)); *Jacobs v. City of Port Neches* 7 F. Supp.2d 829, 833 (E.D. Tex. 1998) ("a filing signed by the nonmovant and reciting that the statements made therein are true and correct under the penalty of perjury constitutes competent summary judgment controverting proof").  Neither Rule 56(e) nor any other authority cited by defendants requires that a declarant expressly aver her competence to testify (as opposed to simply "showing" it in some way), much less prescribes a verbatim mandatory script for competency averments.  Absent a legal showing (that defendants have not made) obliging it to do so, the Court declines to confer talismanic significance on the absence of the word "competent" in a declaration.  Defendants have not suggested, and cannot credibly

opportunity to do so, plaintiffs have eschewed presentation of any argument or evidence in opposition to this Motion.  They have therefore waived the right to be heard on this issue.

It is well established that a litigant cannot manufacture a genuine issue of fact by submitting a "sham affidavit" that contradicts her deposition testimony.  *See, e.g.*, *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003) ("Under the law of this Circuit, we may disregard an affidavit submitted solely for the purpose of opposing a motion for summary judgment when that affidavit is directly contradicted by deposition testimony."); *Van T. Junkins and Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (affiant cannot create genuine issue of fact by contradicting, without explanation, prior clear testimony).[22]  Defendants contend that four separate aspects of Exhibit P contradict, without explanation, Mollie Hosea's sworn deposition testimony and therefore must be struck under the *Van T. Junkins* rule.

In paragraph 4 of Exhibit P, Mollie avers that "Marengo County Sheriff Deputies prevented my sisters and myself from interfering with the burning and taking of our property." (Exh. P, at ¶ 4.)  Defendants contend that excerpts from pages 70 and 74 of her deposition contradict this averment.  They do not.  In those excerpts, she never denied that Sheriff's Deputies prevented her from halting the burning and taking of her property, nor was she asked in those excerpts "to relate everything that occurred at the time of the alleged burning," as defense counsel now characterizes its line of questioning.  (Doc. 114, at 2.)[23]  The Court perceives no

_____

suggest, that Mollie Hosea is incompetent to testify about the matters set forth in Exhibit P (*e.g.*, events she observed, property she once owned, personal knowledge of what became of that property).  Instead, they seek to strike her Declaration by relying on a perceived technical omission that in no way impugns its integrity, veracity or reliability under Rule 56(e).  Exhibit P will not be stricken on the basis of such an ill-conceived objection.

[22]     *But compare Stewart v. Board of Comm'rs of Shawnee County, Kansas*, 216 F. Supp.2d 1265, 1270 (D. Kan. 2002) (considering information in affidavits that served to clarify, explain or correct prior misstatements, as affidavits were not a "sham" with respect to such information); *Brassfield v. Jack McLendon Furniture*, 953 F. Supp. 1424, 1430 (M.D. Ala. 1996) (noting that "sham affidavit" rule bars only affidavit statements that are "inherently inconsistent" with earlier deposition testimony).

[23]     The Complaint specifically alleges that "[w]hen the plaintiff [*sic*] return to recover their personal property in or around September 19, 2002, the Marengo County Sheriff

inherent inconsistency between the quoted section of Mollie Hosea's Declaration, and the excerpted portion of her deposition, as the two blocks of testimony coexist peacefully.  This paragraph is not a sham and will not be stricken.

In her second (misnumbered) Paragraph 4 of her Declaration, Mollie states that "[w]hen we tried to stop the burning and taking of our property, we were taken to jail by the Marengo Sheriff Department.  When we got out of jail, all of livestock, antiques and personal property were gone.  Our house and mobile homes were destroyed.  The only thing that we had left was the clothes on our back."  (Exh. P, at ¶ 4 (second).)   Defendants contend that this statement is rendered a sham by this passage from her deposition:

> "Q:     So when you were arrested, nothing had been burned down?
> "A:     No, sir.  But they had done stripped the place."

(M. Hosea Dep., at 117-18.)  According to defendants, this testimony shows that plaintiffs' personal property was taken <u>before</u> the arrest.  Defendants reinforce this point by reference to various portions of the transcript in which she testified in detail that numerous items had been taken (*e.g.*, livestock, riding lawnmower, hog wire, wash pots, gas fryer, cars trimmers, hoes, syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, antique machines, iron beds, dressers, armoires, big post beds, clothes) in January 2002, long before the September 18 arrest.  (*Id.* at 172-74, 195-97.)

To the extent that the cited portion of the Declaration conflicts with Mollie's deposition testimony, without explanation, it may properly be disregarded.[24]  But the Court perceives no

---

Department detained the plaintiffs, while the other defendants buried [*sic*] and destroyed the personal property of the plaintiffs."  (Complaint, ¶ 18.)  Notwithstanding this specific allegation (and others like it) in the Complaint, defense counsel chose not to ask Mollie point-blank in her deposition whether that event had in fact occurred.  There may well have been a sound strategic basis for that omission; however, by failing to ask such a question, defense counsel never secured direct testimony from Mollie as to whether the Sheriff's Deputies did or did not detain her while her property was being burned and destroyed.  Having opted not to pin Mollie down on this point, defense counsel cannot fault her Declaration as contradicting phantom deposition testimony on that topic.

[24]     Curiously, defendants' Motion does not specifically object to the statement in Paragraph 4 that the Hoseas were taken to jail "when [they] tried to stop the burning and taking of [their] property."  (M. Hosea Decl., ¶ 4.)  But Mollie testified in her deposition that plaintiffs'

inherent conflict between the two sets of testimony for two reasons.  First, even accepting the deposition testimony that many items of the Hoseas' property were stolen in January 2002, there is no inherent contradiction with Mollie's Declaration that all of their property was gone when they were released from jail in September 2002.[25]  To say that plaintiffs had no property in September 2002 is not to say that it was all stolen or destroyed in September 2002, or that none of it had been taken or destroyed in January 2002.  Second, defendants' argument would overlook clear deposition testimony from Mollie that plaintiffs had substantial remaining personal property (including beds, skids, quilts, stove, pots, pans, pictures, and money) in the family house at the time of their arrest.  (M. Hosea Dep., at 180-84.)  Even if the Declaration were properly construed as stating that the Hoseas' personal property was taken and destroyed while they were in jail, that assertion would not be at odds with Mollie's deposition testimony because she testified that plaintiffs still had personal property in the house at the time they went to jail.  Once again, defendants seek to apply the "sham affidavit" rule far too broadly.

Defendants' third and fourth "sham affidavit" arguments fare much better.  Paragraph 2 of the Declaration states, in part, as follows: "After Tommie Reese told us to get off the property, we asked if we could they [*sic*] get our personal property.  Tommie Reese responded that it was too late. ... Tommie Reese further told them [*sic*] that if we return, we would be arrested for trespass."  (Exh. P, at ¶ 2.)  However, when defense counsel specifically inquired during Mollie's deposition as to what Reese told plaintiffs, she reported nothing of this exchange.  The

---

trip to jail preceded the burning of their property.  That being the case, plaintiffs could not have been arrested for trying to stop a burning that had not yet commenced.  Likewise, Mollie's deposition is clear that she and her sisters were not actively trying to thwart the theft of their property when they were arrested for trespass on September 18, 2002.  Those aspects of Paragraph 4 will accordingly be disregarded on summary judgment as irreconcilable with the declarant's sworn deposition testimony, and the Motion is **granted** in that respect.

[25]     This portion of defendants' Motion appears predicated on an inference drawn from the Declaration, rather than its actual words.  Defendants seem to assume that the Declaration states that all of plaintiffs' personal property was stolen and destroyed while they were in jail.  It says no such thing.  To the contrary, it says only that as of the time the Hoseas were released from jail in September 2002, their property was gone.  That statement can be easily reconciled with testimony that certain items were taken in January 2002, without the inherent contradiction that defines a sham affidavit.

following excerpt is critical:

> "Q:    ... [D]id Chief Deputy Reese tell you you had to leave, that you weren't allowed on that land?
>
> "A:    Couldn't stay there no more in that house and shoved us out the door and put the locks on the door.
>
> *           *           *
>
> "Q:    Was anything else said by Chief Deputy Reese?
>
> "A:    Just locked the door."

(M. Hosea Dep., at 24-25.)  Mollie's deposition testimony that defendant Deputy Reese told them only they could not stay in that house cannot be harmonized with her Declaration that Deputy Reese also told them it was "too late" to remove their personal belongings and that they would be arrested for trespass if they returned.  Defense counsel specifically asked the witness to tell him "exactly what happened step by step" (*Id.* at 22), and whether Deputy Reese had said anything else when locking them out of the house.  She responded negatively.  Having done so, she cannot now backtrack and offer, without explanation for the discrepancy, a Declaration ascribing several other statements to Deputy Reese at that time.  That portion of the Declaration clearly violates the "sham affidavit" rule and will not be considered for purposes of ruling on the pending summary judgment motions.  The Court therefore **strikes** the second, third and fifth sentences of Paragraph 2 of the Declaration of Mollie Hosea pursuant to *Van T. Junkins* and its progeny.[26]

Finally, Paragraph 5 of the Declaration alleges that the Hoseas had 200 ducks and 30 donkeys.  (Exh. P, at ¶ 5.)  Yet in her deposition the witness testified that the Hoseas had

---

[26]       Defendants also request that the following sentence from Paragraph 2 be stricken: "Tommie Reese and the other deputies made us leave our home without our personal property." (Exh. P, at ¶ 2.)  There is no inconsistency between that statement and Mollie's deposition; to the contrary, her deposition testimony on this point was that Reese and the other deputies physically "shoved" plaintiffs out of their home and placed a new lock on it so that they could not re-enter. (M. Hosea Dep., at 19-25.)  The deputies' alleged acts of shoving them out of their home and locking their door are readily harmonized with the Declaration's statement that the deputies made plaintiffs leave without their personal belongings.  There being no inherent inconsistency, this statement will not be stricken.

-20-

"[a]bout thirty or sixty head" of ducks, and eight "donkeys."  (M. Hosea Dep., at 38, 42.)[27]  No explanation being offered for the significant numerical discrepancy, the Court will not accept the Declaration testimony on this point pursuant to "sham affidavit" principles.

For all of the foregoing reasons, defendants' fourth Joint Motion to Strike (doc. 114) is **granted in part** and **denied in part**.  The Motion is **granted** as to the following sections of the Declaration of Mollie Hosea: (a) the second, third and fifth sentences of Paragraph 2; (b) the reference in the second Paragraph 4 to plaintiffs being arrested for trying to stop the burning and taking of their property; and (c) the references to 200 ducks and 30 donkeys in Paragraph 5. Those portions of plaintiffs' Exhibit P (doc. 105) are **stricken** pursuant to the "sham affidavit" rule.  In all other respects, the Joint Motion to Strike (doc. 114) is **denied**.

### III.   Factual Background.[28]

Having completed the myriad preliminaries raised by the parties, the Court can finally move on to address the merits of the two pending Motions for Summary Judgment.

### A.   Sale of Plaintiffs' Property and the Unlawful Detainer Action.

In the 1990s, plaintiffs lived on and owned certain real property (the "Property") in Dixons Mill, Marengo County, Alabama.  Although all three Hosea sisters lived there, the Property was actually owned by Fleta Mae Hosea and Floyd Ann Hosea, as Mollie Hosea had conveyed her interest to Floyd Ann.  (M. Hosea Dep., at 11-12.)  In January 1995, the Marengo County Circuit Court entered a judgment against Fleta Mae and Floyd Ann in Civil Action No.

---

[27]     Evidently, these were not "donkeys" in the conventional sense.  Rather, the type of "donkey" claimed by the Hoseas is "a big ole tall bird with a red – orange knot on its head," which plaintiffs had purchased in a set of eight for a total of $15 several years earlier.  (M. Hosea Dep., at 41-43.)

[28]     The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005) (on summary judgment, court must view record and draw all reasonable inferences in light most favorable to nonmoving party).  Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

CV-93-132.[29]  When the Hoseas did not pay the judgment, the judgment creditors initiated appropriate legal action to levy on the Property to satisfy such judgment.

On or about July 6, 2000, the Marengo County Sheriff's Department arranged for publication of a Notice of Publication concerning the Property in the *Democrat Reporter* for four consecutive weeks.  (Langley Decl., ¶ 3 & Exh. A.)  This Notice listed the Property's legal description, and announced that the Sheriff would sell such Property at public auction at the Marengo County Courthouse on August 8, 2000.  (*Id.*)  The Sheriff's sale of this real property was carried out, apparently without protest or dissent by the Hoseas, to satisfy the outstanding judgment.  Defendant Michael Ledkins ("Ledkins") and former defendant William Goodwin ("Goodwin") attended the Sheriff's sale.  (Ledkins Aff., ¶ 2; Goodwin Aff., ¶ 4.)  At that sale, Ledkins and his wife, defendant Judy Ledkins ("Ms. Ledkins"), purchased a portion of the Property, including the 40-acre tract on which plaintiffs actually resided, for the sum of $129,310.34.  (Ledkins Aff., ¶¶ 2-3; Langley Decl., ¶ 7 & Exh. 2.)[30]  Goodwin and his wife, ex-defendant Nedra Goodwin, purchased the remaining real property of the Hoseas being sold at the Sheriff's sale, acquiring approximately 168 acres (which did not include any land where the plaintiffs' residences were located) for the sum of $120,689.66.  (Goodwin Aff., ¶¶ 5, 6 & Exh. 1; Ledkins Aff., ¶ 3; Langley Decl., ¶ 7.)[31]

---

[29]     This judgment was entered in favor of  Barbara J. Baugh, Aaron B.J. Baugh, Thomas Johnson Baugh, Emma Elizabeth Baugh Drinkard and John Patrick Baugh (collectively, the "Baughs"), none of whom are litigants in the instant dispute.  Although its precise subject matter is not germane to these proceedings, the *Baugh* lawsuit apparently related to allegations that the Hoseas had been cutting timber from the Baughs' property and that a member of the Hosea family had placed a mobile home on Baugh land.

[30]     The record shows a discrepancy as to the purchase price paid by the Ledkins for this parcel.  In his Affidavit, Ledkins avers that he paid $120,310.34 for the land.  (Ledkins Aff., ¶ 2.)  But the Sheriff's Deed reflects a purchase price of $129,310.34.  (*Id.* at Exh. 1.)  It appears that the latter figure is correct, so that the sum of the Ledkins' and the Goodwins' purchases would total exactly $250,000; however, the observed discrepancy is immaterial for purposes of the instant Rule 56 motions.

[31]     Defendants maintain that the funds raised in the Sheriff's sale exceeded the outstanding judgment in the *Baugh* matter, and that Langley refunded the resulting overpayment of $14,409.72 to Floyd Ann and Fleta Mae Hosea via letter dated August 21, 2000.  (Doc. 83, Exh. H.)  This exhibit has not been authenticated, nor does Langley assert in his Declaration that

Despite the August 2000 Sheriff's sale, plaintiffs refused to leave the Property, including particularly the family house and other buildings on the land that the Ledkins defendants had purchased.  Ultimately, Ledkins filed an unlawful detainer action against the Hoseas, among others, in Marengo County District Court in an effort to eject them from the Property.  (Ledkins Aff., ¶¶ 4, 5.)[32]  After a default judgment was entered against the Hoseas, the state court entered an order of ejection/eviction on November 27, 2001, at which time it decreed that the Hoseas "are unlawfully detaining real property of" Ledkins, "[t]hat said Defendants are hereby ordered to immediately vacate said real property," and that the Marengo County Sheriff is "authorized to restore the real property in question to [Ledkins] by removing the person and the property of the above set forth defendants from his premises."  (Doc. 83, at Exh. I; *see also* Langley Decl., at ¶ 5.)[33]  Plaintiffs were well aware of the existence of the November 27 Order and its requirement that they vacate the Property immediately.  (Fleta Mae Hosea Dep., at 15.)

### B.   *Plaintiffs' Ejection from the Property in January 2002.*

Sometime after the November 27 Order was entered, Ledkins advised Sheriff Langley "that the Hoseas had not vacated his property and requested that [Langley] carry out the Order of

---

he in fact conveyed that letter and check to the Hoseas.  The letter lacked any mailing address, so it is unclear when, where and how it was delivered to its intended recipients.  Moreover, plaintiffs contend (without record support) that they "never received a check for the excess money."  (Doc. 105, at 1.)  At most, plaintiffs' counsel cites "Fleta's depo" for this proposition.  Such a reference is unacceptable for three reasons: (1) it is the responsibility of counsel, not this Court, to provide appropriate pinpoint citations to the record; (2) plaintiffs' counsel failed to include Fleta Mae Hosea's deposition in their exhibits; and (3) the portions of Fleta Mae's deposition transcript accompanying the Sheriff's Defendants' submissions do not touch on any alleged overpayment.  In spite of those omissions on both sides, the Court need not definitively resolve the question of whether plaintiffs were reimbursed for any overpayment on the *Baugh* judgment, as such question is not material to the issues presented on summary judgment.

[32]     That case was styled *Michael E. Ledkins v. Phil Ford, et al.*, Case No. DV-2001-056.  Named defendants were the Hoseas, as well as Phil Ford and Debra Allen, neither of whom is a party in this action.

[33]     Several defense witnesses allege that the date of this Order was November 7, 2001.  (*See* Langley Decl., ¶ 5; Reese Decl., ¶ 3.; Jordan Decl., ¶ 3.)  That is obviously an error, as the Order is dated November 27, 2001 in four separate places, two of them hand-written and two of them stamped.  (*See* doc. 83, at Exh. I; doc. 109, at Exh. T.)  In any event, the discrepancy is not material.

-23-

the District Court and evict the Hoseas." (Langley Decl., ¶ 6.)  In January 2002, the situation came to a head.  It is undisputed that, approximately one week ahead of time, Deputy Keith Jordan went to the Property, bearing a copy of the November 27 Order for plaintiffs' reference, and informed the Hoseas that they had been ordered to vacate the promises and that officers would physically escort them off the Property on January 25, 2002 if they did not leave and take their personal belongings with them before then.  (Jordan Decl., ¶¶ 2, 4; Fleta Mae Hosea Dep., at 16-17.)  In response, Fleta Mae Hosea testified, "I told them I'm going to stay there. ... I told him I was staying."  (*Id.* at 17.)[34]  One of the Hoseas advised Deputy Jordan that he had best not come alone to evict them "or they would hurt [him]."  (Jordan Decl., ¶ 5.)

Notwithstanding Deputy Jordan's warning and their actual knowledge of the November 27 Order, the Hoseas refused to leave.  Accordingly, on January 25, 2002, defendant Sheriff Langley deployed a sizeable contingent of deputies to the Property to eject the Hoseas.  (Langley Decl., ¶ 7.)  Defendant Chief Deputy Tommie Reese, defendant Deputy Bryant Jones, defendant Deputy Lee Lawrence, and at least two other deputies traveled to the Property on that date to remove the Hoseas.  (Reese Decl., ¶ 4; Jones Decl., ¶ 3; Lawrence Decl., ¶ 3.)[35]  Deputy Reese knocked on the door and, when Mollie Hosea answered, "shoved" her outside.  (M. Hosea Dep.,

---

[34]     Fleta Mae's testimony acknowledging Deputy Jordan's warning visit a week before plaintiffs' eviction was contradicted by Mollie, who denied that any deputy had cautioned plaintiffs that they would be evicted if they did not vacate the premises.  (M. Hosea Dep., at 20-21.)  However lenient the Rule 56 standard may be, it does not entitle plaintiffs to pick and choose between conflicting versions of the facts that different co-plaintiffs may have given to cobble together a version most favorable to them.  *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("When the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant.  Instead, when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.").  On that basis, the Court will credit Fleta Mae's admission that Deputy Jordan had visited the Property to give them a warning, notwithstanding Mollie's denial of same.

[35]     By one account, the entire Marengo County Sheriff's Department, excepting Sheriff Langley, was present on the Property that day.  (M. Hosea Dep., at 24, 168-70.)

-24-

at 19.)  Plaintiffs never refused to leave the Property that day.  (*Id.* at 21.)[36]  That said, Floyd Ann Hosea went to the back of the house and retrieved her deceased son's shotgun.  (*Id.* at 19; Fleta Mae Hosea Dep., at 20, 82.)  Deputy Reese twisted Floyd Ann around, threw her on the floor, extracted the firearm from her grasp, and placed it in a Sheriff's Department vehicle.  (M. Hosea Dep., at 19-20.)  Having been forced out of their house, plaintiffs watched through the windows as Deputy Reese "was going throwing the mattress and everything, tearing up the house."  (*Id.* at 20.)  According to Mollie, Deputy Reese's conduct meant that "we couldn't go back in there.  We left our money and stuff, you know, in the dressers and things."  (*Id.*)  Deputy Reese would not allow plaintiffs back in the house.  (Fleta Mae Hosea Dep., at 20.)  The net effect was that plaintiffs were forced to leave their home without their personal property.  (M. Hosea Decl., ¶ 2.)[37]

Plaintiffs were not arrested on January 25, 2002.  (Reese Decl., ¶ 11; M. Hosea Dep., at 25.)  Rather, after Deputy Reese and his colleagues removed plaintiffs from the house, Deputy Reese placed on a new lock on the residence to keep the Hoseas from reoccupying it, and told plaintiffs that they could not stay there anymore.  (Reese Decl., ¶ 9; Jordan Decl., ¶ 9; M. Hosea Dep., at 22, 130.)  So plaintiffs left their home and their associated personal property, and

---

[36]   Defendants have submitted evidence contradicting plaintiffs' stance on this point, including Deputy Reese's declaration that the Hoseas informed the deputies that "they were not leaving because this was their 'Daddy's land'," that the Hoseas refused to comply with the deputies' instructions to leave, and that one of the Hoseas attempted to strike Deputy Reese.  (Reese Decl., ¶¶ 5, 7-8.)  For Rule 56 purposes, though, plaintiffs' evidence is credited.

[37]   Defendants offer evidence that Deputy Reese informed the Hoseas at the time of their eviction that they would be permitted to remove their personal property from the home upon request to the Sheriff's Department.  (Reese Decl., ¶ 12.)  Defendants further assert that several deputies "pleaded" with the Hoseas to take their belongings.  (Reese Decl., ¶ 6; Jones Decl., ¶ 5; Lawrence Decl., ¶ 5.)  However, Mollie Hosea's narrative is clear that Deputy Reese said nothing to them except that they could no longer stay in the house, after which he threw them out and locked the door.  (M. Hosea Dep., at 23-25.)  Because the record must be construed in the light most favorable to plaintiffs for Rule 56 purposes, the Court does not credit Deputy Reese's statements that he "pleaded" with them to take their belongings with them or that he invited plaintiffs to return to collect their personal property with Sheriff's Department supervision.

apparently began living with nearby relatives.  (M. Hosea Dep., at 110.)[38]

       **C.**      **The Late January / Early February Destruction of Plaintiffs' Property.**

At the time they were evicted, the Hoseas left the following items of personal property on the Property: livestock (including 280 cows, 30-60 ducks, 200 chickens, 8 donkeys, 140 goats and 8 hogs), two rolls of hog wire, five wash pots, six cars, a gas fryer, trimmers, hoes, a syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, two antique machines, three iron beds, three dressers, four armoires, six big post beds, clothes, and a riding lawn mower, among other things (such as quilts, clothes, pots, pans and money).  (M. Hosea Decl., ¶ 5; Ford Decl., ¶ 10; J. Figgers Decl., ¶ 8; Grayson Decl., ¶¶ 3-4; M. Hosea Dep., at 180-84.)[39]

Approximately one week after plaintiffs were evicted, the Hoseas' niece, Iris Johnson, received a phone call indicating that people were breaking into the house and taking or destroying their possessions.  (M. Hosea Dep., at 26-27.)  The Hoseas immediately traveled to the Property, where they observed defendant Ledkins and his son with two pickup trucks and trailers filled with personal property (*e.g.*, claw tubs, clothes, watches, rings, antique heaters, lanterns, churns, fabric, etc.) taken from the house.  (*Id.* at 27-29, 45-46.)  When Fleta Mae

---

[38]      Plaintiffs characterize Sheriff Langley's Declaration as establishing "that the Sheriff's Department intended to take possession of the plaintiff's personal property on the date of the eviction, and to detain the Hoseas' property."  (Doc. 105, at 7.)  The Declaration says no such thing.  Instead, Sheriff Langley avers merely that he instructed Deputy Reese to advise plaintiffs that they could obtain their items of personal property upon request.  (*See* Langley Decl., ¶ 7.)  That the Sheriff's Department may have put a new lock on the house and offered to allow the Hoseas in upon request to remove their belongings is a far cry from the Sheriff's Department obtaining possession of such belongings.  The Court therefore cannot credit plaintiffs' unsupported hypothesis that "the Sheriff's Defendants took possession and control of the Hoseas' property," and that they therefore had "a duty of care to make sure nothing happen [*sic*] to the property."  (Doc. 105, at 22.)

[39]      In an effort to discredit plaintiffs' evidence, defendants proffer testimony from Deputy Reese that he saw only "two to four chickens and a dog left on the property on January 25, 2005 [*sic*]."  (Reese Decl., ¶ 14.)  However, Deputy Reese does not testify that he canvassed the entire 40 acres where plaintiffs' residence was situated in search of farm animals.  More to the point, defendants cannot prevail on summary judgment by offering facts that contradict plaintiffs' account; instead, plaintiffs' version must be credited.  The Court therefore ascribes no weight for Rule 56 purposes to Deputy Reese's allegation that there was no livestock on the property on January 25, 2002 other than a couple of chickens and a dog.

Hosea demanded that Ledkins "put her mama and daddy's whatnots and things back in the house," Ledkins physically pushed her aside.  (*Id.* at 28, 48.)[40]  For her part, Mollie Hosea "went to hollering and praying."  (*Id.* at 48.)  Defendants Rogers and Fuller were also present, helping Ledkins load the trucks with plaintiffs' belongings.  (*Id.* at 47, 150-51.)  It is undisputed that no representatives of the Marengo County Sheriff's Department were on the scene when these events occurred.  (*Id.* at 47-48, 170-71; Reese Decl., ¶¶ 20-22; Jones Decl., ¶¶ 15-17; Lawrence Decl., ¶¶ 15-17.)[41]  Ledkins and his son finally departed with the trucks and trailers laden with the Hoseas' personal belongings.  (M. Hosea Dep., at 48-49.)  Eventually, Rogers and Fuller left too.  (*Id.*)

As of late January / early February 2002, the vast majority of plaintiffs' personal property about which they complain in this litigation had already been removed from the Property. Mollie Hosea testified that the livestock were all gone from the Property by early February 2002, and that she does not know what became of those hundreds of animals.  (M. Hosea Dep., at 49-50, 111-12, 114; *see also* Fleta Mae Hosea Dep., at 61-62.)[42]  Moreover, by early February 2002, the following additional items of the Hoseas' property had already been taken:  wash pots, hog wire, riding lawn mower, cars, gas fryer, trimmers, hoes, syrup grinder and pan, iron wheels, tractor dipper, air compressor, barbecue pit, two antique machines, three iron beds, three dressers, four armoires, six big post beds, and clothes.  (M. Hosea Dep., at 172-74.)  Plaintiffs do not know what happened to their personal property.  (*Id.* at 200-01.)

---

[40]     Deposition testimony reflected that the Hoseas' father had died in 1942, and that their mother had passed away in 1958.  (*Id.* at 31-32.)

[41]     Plaintiffs conjecture that the Sheriff's Defendants might have conspired with the other defendants in a nefarious plot to strip plaintiffs' personal property.  Indeed, they suggest that Ledkins and Fuller "could have been putting the property in storage for the Sheriff to get upon request."  (Doc. 105, at 13.)  Such unsupported innuendo and idle speculation cannot be credited on summary judgment.

[42]     The following excerpt from Mollie Hosea's deposition is instructive:

"Q:     And when you went back that next week when the trucks were there, you said that all the animals were gone?
"A:     Everything was gone."

(M. Hosea Dep., at 111.)

-27-

There is no evidence that plaintiffs reported the disappearance of their personal property or the conduct of Ledkins, Rogers and Fuller to the Marengo County Sheriff's Department or any other law enforcement authorities in late January or early February 2002.

### D.    Events of September 2002.

Plaintiffs never returned to the Property until approximately late August or early September 2002. (M. Hosea Dep., at 133-34.) Eventually, however, the Hoseas came back to the Property and resumed living there in dwellings ancillary to the three-bedroom wooden family house from which they had been evicted. (*Id.* at 51-52, 66-67.) Plaintiffs knew that their actions were directly contrary to Deputy Reese's directives in January 2002 that they could not live there any more. (*Id.* at 131, 136.) Mollie lived in a custom-made home on the Property, and Fleta Mae lived in a trailer on the Property. (*Id.* at 61-62, 131; Fleta Mae Hosea Dep., at 166-68.) Presumably, both structures contained personal property belonging to plaintiffs.

On or about September 18, 2002, the Sheriff's Department received a complaint from Ledkins that the Hoseas were trespassing on the Property, blocking his road, and beating on his vehicle. (Langley Decl., ¶ 9; Reese Decl., ¶ 15.) Deputies Wayne Leonard and Don Lewis were dispatched to investigate the matter. (Langley Decl., ¶ 10; Reese Decl., ¶ 16.) Deputy Leonard informed plaintiffs that they were trespassing on Ledkins' land, but plaintiffs insisted that the Property belonged to them. (M. Hosea Dep., at 87-88.)[43] When plaintiffs refused to leave, they were arrested at 9:20 a.m., taken to the Marengo County Detention Center, charged with

---

[43]    Plaintiffs' brief characterizes their presence on the property that day as being with the intent "to stop the taking of their personal property." (Doc. 105, at 9.) This slant on the facts is unsupported by the record. Plaintiffs cite no evidence that supports this construction of the facts, and the Court's own review of the record divulges no evidence that any of plaintiffs' personal items were being actively removed on September 18, 2002, or that they returned to the property on that date to waylay such activities. At most, two plaintiffs' witnesses speculate that the Hoseas returned to their homestead that day to get their personal belongings. (Ford Decl., ¶ 4; J. Figgers Decl., ¶ 3.) No basis for personal knowledge appears in such statements, which are evidently the result of guesswork by Ford and Figgers; therefore, their testimony will not be credited on that point. The only credible evidence is that plaintiffs returned to the property in September 2002 not to prevent others from carting away their personal items or to remove the items themselves, but because they intended to start living there again, in defiance of both the court order and the Sheriff's Department's instructions. (M. Hosea Dep., at 51-52.) As such, this unsupported, conclusory framing of the facts will not be considered on summary judgment.

-28-

Criminal Trespass in the Third Degree, and released on $300 bond.  (Leonard Decl., ¶¶ 4-5;

Plaintiffs' Exh. F; M. Hosea Dep., at 52, 86-87, 163; Fleta Mae Hosea Dep., at 35, 161;

Defendants' Exh. O.)[44]  The arrest reports reflect that plaintiffs neither resisted arrest nor were

armed.  (*See* Defendants' Exh. O.)  Ledkins was present at the time of plaintiffs' arrest.  (M.

Hosea Dep., at 118, 159.)[45]  When Deputy Leonard took plaintiffs to jail, he told them "don't

come back on the place no more."  (Fleta Mae Hosea Dep., at 62.)  Once again, however,

plaintiffs chose to disregard these instructions.

On or about September 24, 2002,[46] plaintiffs came back on the Property, where they

witnessed the burning of several buildings by Ledkins.  As they arrived, plaintiffs saw Deputy

Reese engaged in a conversation with Phil Ford, with Ford arguing that the buildings should not

be burned and Deputy Reese threatening to remove Ford from the Property.  (M. Hosea Dep., at

---

[44]     Although not particularly relevant to these proceedings, the record reflects that
the Hoseas were found guilty of Criminal Trespass in the Third Degree in Marengo County
District Court on March 14, 2003, and ordered to vacate the property within 30 days.
(Defendants' Exh. P, Q, R.)  All three Hoseas have appealed their convictions to Circuit Court,
where their cases evidently remain pending today.  (Defendants' Exh. J, K, L, S.)

[45]     Prior to plaintiffs' arrest, Ledkins had warned them that they were trespassing on
his land and that they were going to be arrested if they did not leave.  (M. Hosea Dep., at 162.)
Mollie Hosea responded by telling Ledkins that it was not his land, but that the land belonged to
plaintiffs' deceased father.  (*Id.* at 161-63.)  When the Hoseas rejected his warning, Ledkins
called the Sheriff's Department and informed them of the situation, culminating in plaintiffs'
arrest.  (*Id.* at 163.)

[46]     The record is in a state of disarray as to the exact date of this occurrence.
Plaintiffs pegged the burning of their buildings as happening at various times from January 2002
to late August 2002 to several dates in September 2002.  (*See, e.g.,* Fleta Mae Hosea Dep., at 45;
M. Hosea Dep., at 53, 64, 76-77, 177-78.)  Mollie Hosea candidly conceded, "I can't get that
date straight," when asked for at least the sixth time during her deposition when the exact date of
the burning was.  (M. Hosea Dep., at 156.)  Ultimately, Mollie stated with apparent exasperation
in response to at least the eighth round of questioning about dates, "They burnt them in
September.  That's all I can say."  (*Id.* at 178.)  Despite the obvious confusion, nothing had been
burned when plaintiffs were jailed for trespass on September 18, and the burning(s) occurred
sometime after plaintiffs were released from jail.  (M. Hosea Dep., at 117-19, 202.)  Plaintiffs'
counsel having selected September 24, 2002 as the date of the burnings (*see* doc. 105, at 4), and
that date having as much evidentiary support in the record as any other (*see* Plaintiffs' Exh. C,
Ford Decl., ¶ 5), the Court will treat that date as correct for purposes of this Order, but
recognizes the divergent evidence as to the precise date of these events.

65, 69-71; Ford Decl., ¶ 7.)[47]  Deputy Reese also threatened to jail Ford when he continued to protest the burning, and eventually placed Ford in his patrol car until the conclusion of the incident.  (Ford Decl., ¶ 7.)  Deputies Jones and Lawrence were also present, and together with Deputy Reese told anyone who attempted to interfere in the burning to cease doing so, on penalty of being jailed.  (*Id.*, ¶¶ 6, 8.)  Deputy Reese specifically told the Hoseas that the deputies were present "to prevent them from interfering with the burning and destroying of the Hoseas' property."  (J. Figgers Decl., ¶ 3.)  Plaintiffs also saw defendant Jimmy McDonald operating a bulldozer on the Property to level some of the structures.  (M. Hosea Dep., at 65, 72, 147.)  The bulldozer destroyed the Hoseas' hog pens and chicken pens, with the animals still inside.  (J. Figgers Decl., ¶ 5.)  Deputy Reese informed Ledkins and McDonald, "Y'all go on and do what you got to do."  (M. Hosea Dep., at 72.)  As plaintiffs and Deputy Reese (and other assembled onlookers) watched, Ledkins, Fuller, Rogers and Goodwin poured gasoline on the buildings and set them ablaze.  (*Id.* at 73; Ford Decl., ¶ 8; J. Figgers Decl., ¶ 4.)  Ledkins burned down the family wooden house, as well as a smaller house, a barn, several "junk houses" and multiple trailers on the Property.  (Fleta Mae Hosea Dep., at 57-58, 60; M. Hosea Dep., at 63-64.)[48]  McDonald assisted with the burning.  (M. Hosea Dep., at 144.)

The burning attracted more than 100 spectators, with Mollie Hosea likening the event to being "like somebody done got killed."  (M. Hosea Dep., at 106-07.)  Eventually, the fire

---

[47]     For his part, Deputy Reese denies having been present or having any knowledge of activities on the Property relating to the burning of homes and the destruction of property.  (Reese Decl., ¶¶ 19-22.)  On summary judgment, of course, the Court reviews the evidence in the light most favorable to plaintiffs; therefore, Deputy Reese's protestations will not be credited for Rule 56 purposes.  Deputies Jones' and Lawrence's averments that they were not present at the time of the burning are disregarded for the same reasons.  (Jones Decl., ¶¶ 14-17; Lawrence Decl., ¶¶ 14-17.)

[48]     Plaintiffs' counsel incorrectly argues that defendants burned a mobile home belonging to Fleta Mae Hosea, as well as a custom-made mobile home belonging to Mollie Hosea.  (Doc. 105, at 4.)  Plaintiffs' testimony is to the contrary.  Indeed, Fleta Mae testified that her trailer was neither burned nor even touched.  (Fleta Mae Hosea Dep., at 166-68.)  Likewise, Mollie denied that her custom-made home was burned, and testified that she continues to live in it today.  (M. Hosea Dep., at 62, 64, 115-16.)  Plaintiffs' counsel's assertions are not credited to the extent that they contradict their clients' sworn testimony.

department was summoned to the scene.  (*Id.* at 167-68.)  Defendant Leroy Rogers was also at the Property at the time of the burning, where he collected some of the Hoseas' personal belongings and assisted with the burning and destruction.  (*Id.* at 197-98; M. Hosea Decl., ¶ 6.)  When plaintiffs accosted Rogers, he told them that he could take their clothing and lawn equipment if he wanted to.  (M. Hosea Dep., at 198-99.)  Rogers told Figgers that he had taken personal property off the site at that time.  (Figgers Decl., ¶ 7.)   Indeed, when Mollie Hosea saw plaintiffs' personal property in Rogers' yard and home, Rogers explained that he had been told to take whatever he wanted from the Property.  (M. Hosea Decl., ¶ 6.)  That same day, Ledkins loaded the Hoseas' goats onto his truck and, when the truck was full, proceeded to shoot and kill the remaining goats.  (Ford Decl., ¶ 9.)  Ledkins admitted to Figgers that he had shot and killed plaintiffs' goats.  (Figgers Decl., ¶ 6.)[49]

Plaintiffs' evidence is that the removal of their personal property was not confined to two discrete instances in January 2002 and September 2002.  Rather, Phil Ford asserts that he personally witnessed Ledkins, Fuller and Rogers removing plaintiffs' property at various intervals spanning from January 2002 through November 2005.  (Ford Decl., ¶ 3.)

## IV.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden,

---

[49]      It is unclear how the testimony regarding the taking and killing of plaintiffs' livestock on September 24, 2002 can be squared with Mollie's testimony that all of the livestock were gone by early February 2002.  No party has made any attempt to explain or address this glaring discrepancy.

the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).   However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).

**V.     Analysis of Sheriff's Defendants' Motion for Summary Judgment.**[50]

As discussed *supra*, the Order (doc. 39) dated February 10, 2005 resulted in the dismissal of all state law claims against the Sheriff's Defendants, in both their individual and their official capacities, as well as the dismissal of all federal claims (Counts I through IV) against them in their official capacities.  Thus, the only remaining causes of action against the Sheriff's Defendants are individual-capacity claims as follows: (i) a claim under 42 U.S.C. § 1983 that the Sheriff's Defendants deprived plaintiffs of their constitutional rights, including specifically their "freedom from illegal seizure of [their] property," "freedom from illegal detentions," "enjoyment of life, liberty and property and freedom from their deprivation without due process of the law," "equal protection of the law," and the like (Count I); (ii) a claim under § 1983 and § 1985 that the defendants conspired to violate plaintiffs' constitutional rights, including their right to own property, their right to a fair trial, their right not to be deprived of property without due process of law, their right to equal protection, and their rights under the Ninth and Tenth Amendments (Count II); (iii) a claim under 42 U.S.C. § 1982 that "plaintiffs were denied the peaceful

_____

[50]     The Sheriff's Defendants' Motion for Summary Judgment (doc. 81) incorporates a nearly 11-page Narrative Statement of Undisputed Facts.  Their 23-page Memorandum of Law (doc. 82) includes no recitation of facts.  A party may not circumvent the 30-page briefing limitation set forth in Local Rule 7.1(b) by disaggregating the fact and law portions of its brief into two different filings.  The proper approach for Sheriff's Defendants would have been either (a) to submit a consolidated memorandum (addressing both facts and law) of 30 pages or less, or (b) to request an enlargement of the LR 7.1(b) page limitation.  Either way, the suggested determinations of fact and conclusions of law would properly be submitted as a separate document, distinct from the brief, pursuant to LR 7.2(a).  In its discretion, the Court will consider the Sheriff's Defendants' summary judgment submissions in their current form, notwithstanding their nonconformity with the Local Rules.

ownership of their land by the defendants because plaintiffs are of African-American descent and race" (Count III); and (iv) a claim of conspiracy to violate civil rights, pursuant to §§ 1983 and 1985, that appears largely redundant of Count II (Count IV).

The Sheriff's Defendants' Motion for Summary Judgment identifies a plethora of potential grounds for relief, including a statute of limitations defense, a ripeness defense, a lack of standing defense, qualified immunity, a lack of evidence of race discrimination, a lack of evidence of a constitutional deprivation of any stripe, and quasi-judicial immunity. The Court will assess these defenses in turn.

### A. *Statute of Limitations.*

This is not the first time that the Sheriff's Defendants have invoked a limitations defense; indeed, this ground was covered extensively in connection with their Motion to Dismiss (doc. 5). The February 10 Order (doc. 39) explained in detail that Counts I through IV were subject to a two-year limitations period, that the Complaint was filed on September 20, 2004, that the Complaint identified wrongs occurring on September 19, 2002, and that equitable tolling warranted a finding that the Complaint was timely filed, inasmuch as the courthouse was inoperative from September 16, 2004 through September 19, 2004 due to Hurricane Ivan.

The Sheriff's Defendants now refine their statute of limitations defense to assert that the Complaint should be dismissed insofar as it relies on "any facts alleged to have occurred prior to September 18, 2002," the date of plaintiffs' arrest. (Doc. 82, at 2-3.) In particular, the Sheriff's Defendants request dismissal of plaintiffs' claims on limitations grounds to the extent that they rely on the events of January 2002, when the Sheriff's Defendants evicted plaintiffs from the Property, and when most of plaintiffs' personal property was taken. Plaintiffs respond that they are entitled to the benefit of Alabama's continuous tort doctrine, and that a reasonable jury could find in any event that there was no intent to dispossess the Hoseas of their property until after September 18, 2002.

### 1. *Continuous Tort Doctrine.*

Plaintiffs correctly observe that Alabama courts have recognized a continuous tort theory for tolling otherwise applicable limitations periods. *See, e.g., LaBauve v. Olin Corp.*, 231 F.R.D. 632, 655-57 (S.D. Ala. 2005). "When a tort is deemed continuous, the limitations period runs from the last date the plaintiff was exposed to damages." *Haynie v. Howmedica Osteonics*

*Corp.*, 137 F. Supp.2d 1292, 1294 (S.D. Ala. 2000); *see also Reichert v. City of Mobile*, 776 So.2d 761, 766 (Ala. 2000) (continuous torts toll running of statutory limitations period).  Under Alabama law, a continuous tort occurs when a defendant engages in "repeated tortious conduct which has repeatedly and continuously injured a plaintiff." *Moon v. Harco Drugs, Inc.*, 435 So.2d 218, 220 (Ala. 1983).  Where a continuous tort exists, the result is analogous to continuing trespass, such that "the repeated actions of the defendants combined to create a single cause of action in tort." *Id.* at 221.  The ultimate effect of a continuous tort is to extend the statute of limitations by compressing a protracted course of conduct into a single cause of action.  *Id.* However, the continuous tort doctrine is not available where a single act is followed by multiple consequences, but rather requires "repetitive acts or ongoing wrongdoing." *Payton v. Monsanto Co.*, 801 So.2d 829, 835 & n.2 (Ala. 2001).

The first insurmountable hurdle encountered by plaintiffs is that "when a Section 1983 action accrues is a question of federal law." *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (explaining that only the length of the limitations period, and closely related questions of tolling and application, are governed by state law); *see also Uboh v. Reno*, 141 F.3d 1000, 1002 (11th Cir. 1998) (in § 1983 context, "[t]he question of when the limitations period begins to run, however, is one of federal law"); *Kelly v. Serna*, 87 F.3d 1235, 1238-39 (11th Cir. 1996) ("Accrual of a cause of action under 42 U.S.C. § 1983 is a question of federal law.").  Plaintiffs identify no authority and offer no explanation for how Alabama's continuous tort doctrine has any impact on the accrual of plaintiffs' federal causes of action under §§ 1982, 1983 and 1985.

Even if Alabama's continuous tort doctrine was relevant in § 1983 cases, the record demonstrates that it does not apply here.  Plaintiffs accuse the Sheriff's Defendants of several discrete incidents of wrongdoing, including the following: (i) ejecting them from the family house in January 2002; (ii) arresting plaintiffs in September 2002; and (iii) being present for the burning of plaintiffs' buildings and personal belongings in September 2002.[51]  These

---

[51]     The Court is cognizant that Phil Ford avers that defendants Ledkins, Rogers and Fuller continuously hauled away plaintiffs' property from January 2002 through November 2005.  (Ford Decl., ¶ 3.)  While that evidence might support a continuous tort theory against those three defendants, it has no bearing on the proper limitations period for the Sheriff's Defendants, whose alleged involvement was confined to those three discrete incidents.

circumstances are not akin to those in which Alabama courts have recognized a continuous tort, such as "when an employer exposes its employee on a continuing basis to harmful substances and conditions," "when there is a single sustained method pursued in executing one general scheme" or "when a landowner seeks damages for the contamination of a well or stream." *Moon*, 435 So.2d at 220-21.  Rather than being a case of repetitive acts or ongoing wrongdoing causing continuous, cumulative injury, this is a case in which defendants are accused of discrete misdeeds causing discrete injuries.  The continuous tort doctrine has no application here.  *See, e.g., Payton*, 801 So.2d at 835 & n.2; *Hawthorne Land Co. v. Occidental Chemical Corp.*,  431 F.3d 221, 230 (5th Cir. 2005) (for continuous tort doctrine to be triggered, "the conduct, and not just the damage, must be continuous"); *Flowers v. Carville,* 310 F.3d 1118, 1126 (9th Cir. 2002) (finding that alleged paramour of former U.S. president could not avail herself of continuous tort doctrine for tort claims against former First Lady predicated on discrete acts of disclosing private information and organizing break-ins); *In re Casini*, 307 B.R. 800, 814 (Bkrtcy.D.N.J. 2004) ("A continuous tort argument is more appropriate for claims that are inherently and cumulatively wrongful, rather than discrete wrongful acts."); *Simpson v. Burrows*, 90 F. Supp.2d 1108, 1125 (D. Or. 2000) ("where the evidence is that a plaintiff was harmed by each act in a series, the continuing tort theory does not apply").

    For all of these reasons, the continuous tort doctrine cannot save plaintiffs' federal causes of action against the Sheriff's Defendants to the extent they rely on pre-September 2002 events.

        2.    *Lack of Intent to Dispossess Prior to September 2002.*

    Plaintiffs next argue that their claims are not time-barred because "[a] reasonable jury could conclude that the intent to dispossess Hoseas of their property did not take place until after September 18, 2002."  (Doc. 105, at 12.)  This argument misses the point.  In § 1983 cases, the statute of limitations begins to run when "the plaintiffs know or should know (1) that they have suffered the injury that forms the basis of their complaint and (2) who has inflicted the injury." *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).  Surely, as of early February 2002, plaintiffs knew that they had been ejected from the Property, that their livestock and personal property had been removed, that the Sheriff's Defendants had performed the ejection, and that Ledkins and others had removed the personal belongings.  As a result, the limitations clock began ticking no later than February 2002.  Plaintiffs cite no authority (and the Court is aware of

none) standing for the proposition that the limitations period in § 1983 actions is computed by reference to the defendants' state of mind rather than the date of the alleged constitutional deprivation.  This contention is unavailing.[52]

### 3.  Certain Aspects of Plaintiffs' Claims Are Time-Barred.

Based on the foregoing, it is clear that plaintiffs' federal claims are untimely as against the Sheriff's Defendants to the extent they rely on events prior to September 2002.  As such, while the ejection of the Hoseas from the Property in January 2002 and the disappearance of their livestock and other personal property a week later may be helpful background facts, those events are not themselves actionable under 42 U.S.C. §§ 1982, 1983 or 1985 because they occurred outside the relevant two-year limitations period governing Counts I through IV of the Complaint.  Because the Complaint was not filed timely as to those occurrences, plaintiffs cannot predicate their federal causes of action on the Sheriff's Defendants' act of evicting plaintiffs from the Property in January 2002.  To the extent that Counts I through IV rest on events predating September 2002, they are time-barred and are properly **dismissed** against the Sheriff's Defendants.

Of course, this result is not, in and of itself, fatal to the Complaint.  Counts I through IV do not purport to rest exclusively on events predating September 2002; to the contrary, the September 2002 arrest and subsequent burning lie at the heart of those causes of action.  To the extent that Counts I through IV rest on events occurring in or after September 2002, they are not

---

[52]        To the extent that plaintiffs would invoke the so-called "discovery rule," their argument must fail.  It is true that the limitations period in § 1983 actions does not begin to run until facts which support the claim are or should be apparent to a person with reasonably prudent regard for his rights, and that § 1983 actions do not accrue until the plaintiff knows or should know both that he has been injured and the identity of the person(s) responsible.  *See Mullinax*, 817 F.2d at 716; *Ashcroft v. Randel*, 391 F. Supp.2d 1214, 1219-20 (N.D. Ga. 2005) ("The statute of limitations clock begins to run when the facts which support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.").  But plaintiffs have not come forward with any evidence suggesting any discontinuity or delay between the occurrence of the alleged wrongful acts in January and early February 2002, and plaintiffs' recognition that they had been injured and that defendants were responsible.  Indeed, plaintiffs witnessed the alleged wrongful acts firsthand, so any suggestion of lack of awareness would flirt with frivolity.  The discovery rule cannot expand the scope of plaintiffs' federal claims against the Sheriff's Defendants beyond the two-year period.

time-barred and will be considered on the merits.[53]

**B.     Ripeness/Standing Objections.**

The Sheriff's Defendants' next ground for attacking plaintiffs' claims is that they are not ripe, pursuant to *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and that even if they were ripe, the claims of Fleta Mae and Mollie Hosea are barred for lack of standing. These loosely related threshold contentions may be resolved quickly.[54]

1.     *Application of* Heck v. Humphrey.

The Sheriff's Defendants invoke *Heck* for the proposition that plaintiffs' claims for damages that relate to their arrests must be dismissed for want of subject matter jurisdiction. The *Heck* Court held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ..., or called into question by a federal court's issuance of a writ of habeas corpus."  512 U.S. at 486-87.  The problem with this argument is that plaintiffs are not seeking damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions

---

[53]     This rationale has no bearing on the state law claims found at Counts V and VI, which are no longer pending against the Sheriff's Defendants but remain in play as to all other defendants.  Counts V and VI are subject to a much lengthier, six-year limitations period. *See* Ala. Code § 6-2-34(3) (assigning a six-year limitations period to actions for detention or conversion of personal property); *Crowe v. City of Athens*, 733 So.2d 447, 450-51 (Ala.Civ.App. 1999) (recognizing and applying six-year limitations period to conversion claim).  Therefore, the January and February 2002 events are germane to, and will be considered in connection with, plaintiffs' state-law claims against defendants Ledkins, Ms. Ledkins, Rogers, Fuller and McDonald.

[54]     Plaintiffs do not aid their cause by submitting an opposition brief that ignores the ripeness and standing issues.  It is not the responsibility of this Court to formulate plaintiffs' summary judgment arguments for them.  *See Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments ....") (citation omitted).

whose unlawfulness would render a conviction or sentence invalid.[55]  Plaintiffs do not seek damages for their trespass convictions, and they were never imprisoned.  Thus, *Heck* is innaposite.

Nonetheless, the movants persist that "[a] monetary recovery by the Hoseas on their federal civil claims in this litigation would necessarily call into question their criminal trespass convictions."  (Doc. 82, at 4.)[56]  The Court disagrees.  Under the particular circumstances presented here, plaintiffs' claims challenging the propriety of their arrest have no bearing on the legitimacy or validity of any outstanding criminal judgment against them; therefore, defendants' invocation of *Heck* is misplaced and unavailing.  *See Heck*, 512 U.S. at 487 ("But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed ....").  Indeed, the Eleventh Circuit has held that "[b]ecause an illegal search or arrest may be followed by a valid conviction ... a successful § 1983 action for Fourth Amendment search and seizure violations does not necessarily imply the invalidity of a conviction. As a result, *Heck* does not generally bar such claims."  *Hughes v. Lott*, 350 F.3d 1157, 1160-61 (11th

---

[55]     This infirmity can come as no surprise to the Sheriff's Defendants.  After all, the Court previously gave short shrift to their invocation of *Heck* in their motion to dismiss, reasoning that *Heck* "has no application here, inasmuch as plaintiffs do not seek recovery based on an allegedly unconstitutional conviction or imprisonment."  (Order (doc. 39) dated February 10, 2005, at 23 n.28.)  Nothing has changed in the interim, and the February 10 Order's reasoning on this point holds with continuing force today.

[56]     The Sheriff's Defendants' reasoning is opaque.  Plaintiffs allege that the Sheriff's Defendants, among other things, deprived them of their property without due process of law by standing idly by as their belongings were ransacked and destroyed, and that they also improperly detained plaintiffs.  If plaintiffs were to succeed on these claims, the impact (direct or indirect) on their trespass convictions would be nonexistent.  The Sheriff's Defendants protest that a successful challenge to plaintiffs' arrests would necessarily undermine the validity of their criminal convictions.  But they never explain how.  Clearly, not every attack on the manner and implementation of an arrest casts a shadow on the ensuing criminal judgment.  *See Wells v. Cramer*, 2005 WL 3196630, *2 (11th Cir. Nov. 30, 2005) (plaintiff's claims that officers used excessive force in arresting him were not barred by *Heck*, inasmuch as he could prevail on such claims without necessarily implying invalidity of underlying conviction).  The Sheriff's Defendants' reliance on innuendo and speculation, rather than drawing a tangible nexus between the arrest-related claims and the convictions, is fatal to their *Heck* defense.

Cir. 2003); *see also Shelley v. Wilson*, 2005 WL 2596872 (3d Cir. Oct. 14, 2005) (district court erred in finding false arrest claims barred under *Heck*); *Laurino v. Tate*, 220 F.3d 1213 (10th Cir. 2000) (proof that police lacked probable cause to arrest does not necessarily imply invalidity of conviction).[57]   The *Hughes* rationale is compelling, directly applicable to these circumstances, and unrebutted by Sheriff's Defendants.   Accordingly, the Court declines the Sheriff's Defendants' invitation to expand dramatically the breadth and scope of *Heck*, and **denies** that aspect of their Motion for Summary Judgment.

> 2.     *Standing of Plaintiffs Fleta Mae and Mollie Hosea.*

Next, the Sheriff's Defendants argue that plaintiff Fleta Mae Hosea has failed to make an adequate showing of standing.   Under long-established law, a plaintiff has standing under the Constitution only if, *inter alia*, she has suffered an injury in fact that is concrete and particularized, and actual or imminent.   *See, e.g., Sierra Club v. Johnson*, --- F.3d ----, 2006 WL 146230, *5 (11th Cir. Jan. 20, 2006).   According to the Sheriff's Defendants, Fleta Mae cannot meet her minimum burden of showing an injury in fact because she did not own any of the property allegedly destroyed by defendants.

This assertion seizes on isolated passages from Fleta Mae's deposition, ignoring testimony to the contrary and countervailing inferences in the summary judgment record.   To be sure, at various junctures, Fleta Mae testified that she did not own any of the cows or goats, and that nothing that belonged to her was burned.   (Fleta Mae Dep., at 67-68, 155, 167-68.)   Considered in context, however, the testimony of Fleta Mae and her sister Mollie makes clear that most of the personal property on the Property was owned jointly by the three sisters (with or without other family members).   For instance, when asked who owned the goats, ducks and

---

[57]     Of course, there may be circumstances where a § 1983 claim related to an arrest would implicate *Heck* principles.   For example, if a plaintiff convicted of resisting arrest alleges unreasonable seizure in a § 1983 action, success on that claim could negate an element of the offense of resisting arrest.   Therefore, *Hughes* properly cautions that "the court must look to both the claims raised under § 1983 and to the specific offenses for which the § 1983 claimant was convicted."   350 F.3d at 1161 n.2.   Such an analysis here reveals no discernable linkage between the Hoseas' § 1983 claims and their trespass convictions; indeed, a plaintiffs' judgment on those claims would not appear to compel, imply or even support an inference that they were not actually trespassing on September 18, 2002.

chickens, Fleta Mae testified that the "family" owned them.  (*Id.* at 68, 155.)  The record certainly supports an inference that Fleta Mae was part of that "family" and that she therefore had an ownership interest in that livestock.[58]

What, then, of Fleta Mae's statements during her deposition that "I ain't owned nothing" and "Wasn't nothing of mine burned" (*Id.* at 155, 168)?  On the record presented here, a reasonable factfinder could wave those statements away as the product of plaintiffs' unconventional notions toward ownership.  Several deposition excerpts suggest that plaintiffs distinguish between items they own themselves and items they own jointly with others, stating that they did not own the latter category when they in fact meant that they owned the items jointly with others.  For example, when asked about goats, Fleta Mae testified "I didn't own none," moments after responding to the question "Who owned the goats?" by saying "Family did.  All of them."  (*Id.* at 68.)  This construction of the evidence is bolstered by a very instructive passage from Mollie's deposition:

> "Q:    So what was left on September 19th, 2002, before this house was burned was an old family house where nobody was living in but in it, it contained quilts, stoves, pots, pans, and money?
> "A:    Yes.
> "Q:    Who owned the beds?
> "A:    That's the family house.  We don't own nothing when you in a family outfit."

(M. Hosea Dep., at 182.)  Thus, a reasonable view of the record is that Fleta Mae's statements that nothing of hers was burned and destroyed actually meant that she lacked sole ownership of anything that was burned and destroyed.  There is ample evidence in the record from which a reasonable factfinder could conclude that Fleta Mae possessed, at a minimum, joint ownership over the damaged and destroyed personal property at issue in this litigation.[59]  For example,

_____

[58]    This interpretation of the evidence is corroborated by Mollie Hosea, who explained that the family "just kind of shared" the ducks.  (M. Hosea Dep., at 40-41.)

[59]    Support for this reading of the testimony may be found in Fleta Mae's own deposition.  Even as she denied owning any cows, when asked "[w]hat personal property do you claim that you lost as a result of what happened ... on January 25, 2002," Fleta Mae answered, "They got all the cows."  (Fleta Mae Dep., at 61.)  Rather than following up on the apparent inconsistencies between Fleta Mae's testimony as to what she personally owned, and rather than trying to ferret out whether her answers were the product of confusion over the concepts of sole

along with Floyd Ann, Fleta Mae co-owned the Property prior to the Sheriff's sale; therefore, it defies logic to suggest that none of the personal property on the Property belonged to her other than the contents of a single trailer.  In short, Fleta Mae has standing to pursue her claims, and the Sheriff's Defendants' attempt to dismiss her claims for want of standing must fail.  The same reasoning obviates the Sheriff's Defendants' related claim that Mollie Hosea lacks standing because "she did not have an interest in the personal property allegedly stolen or burned."  (Doc. 82, at 7.)  As set forth above, the record supports an inference otherwise, based on principles of joint ownership, and the Court readily concludes that she has met the minimal threshold of showing an injury in fact for standing purposes.

> ### C. *Qualified Immunity.*

The Sheriff's Defendants also contend that they are entitled to qualified immunity as to plaintiffs' claims under 42 U.S.C. § 1983. Where, as here, government officials are sued in their individual capacity for money damages based on alleged civil rights violations, they may posit an affirmative defense of qualified immunity.  *See Swint v. City of Wadley, Ala.*, 51 F.3d 988, 994 (11th Cir. 1995).  The Supreme Court has held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L. Ed.2d 396 (1982).  As such, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).  To assess their qualified immunity defense, the Court must examine whether the Sheriff's Defendants can establish that they were performing discretionary functions, and, if so, whether plaintiffs can show that the Sheriff's Defendants' conduct violated clearly established rights of which a reasonable person would have known.

> #### 1. The "Discretionary Function" Element.

"[I]n order to receive qualified immunity, the public actor must prove that he was acting

---

ownership versus joint ownership, defense counsel chose not to explore the matter further, but simply pressed the portions of the record that supported their position while ignoring the others. Such tactics are unavailing on summary judgment.

within the scope of his discretionary authority when the allegedly wrongful acts occurred."
*Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004); *see also
Harris v. Coweta County, Ga.*, 433 F.3d 807, 811 (11th Cir. 2005).  This burden rests with the
public official, and failure to satisfy it negates the qualified immunity defense.  *See Holloman ex
rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (explaining that if defendants
cannot show that they were engaged in a discretionary function, they are ineligible for qualified
immunity).  In assessing whether an official was engaged in a discretionary function, "[w]e ask
whether the government employee was (a) pursuing a legitimate job-related function (that is,
pursuing a job-related goal), (b) through means that were within his power to utilize."  *Id.* at
1265.

Initially, the Sheriff's Defendants shrug off their burden of showing a discretionary
function, offering only a conclusory footnote that it "is an exceedingly low hurdle to clear and is
easily surmounted in the instant case," without explaining why.  (Doc. 82, at 7 n.3.)  In their
reply brief, however, they expound on this point by arguing that because their actions were taken
to enforce a court-ordered eviction, they were clearly performing official duties as Sheriff and
Deputy Sheriffs, such that their conduct lies within the ambit of a discretionary function.  (*See*
doc. 108, at 6.)[60]  The undersigned agrees.  Plaintiffs' claims against the Sheriff's Defendants
center on allegations that those defendants wrongfully arrested plaintiffs on September 18, 2002,
then stood idly by several days later as other defendants burned and took plaintiffs' property.
The wrongful acts and omissions that plaintiffs attribute to the Sheriff's Defendants
unquestionably relate to ordinary law enforcement functions, the performance of their official

---

[60]     Plaintiffs contest this point, insisting that the Sheriff's Defendants were engaged
in "operational functions of government" as to which qualified immunity does not apply.  (Doc.
105, at 8.)  Plaintiffs are mistaken.  The only case they cite in support of their position, *Lenz v.
Winburn*, 51 F.3d 1540 (11th Cir. 1995), does not recognize a distinction between discretionary
functions and operational tasks, nor has the Court's research identified any meaningful
difference in that regard.  To the contrary, the Eleventh Circuit has made clear that, while the law
often distinguishes between discretionary functions and ministerial tasks, "[i]n the qualified
immunity context, ... we appear to have abandoned this 'discretionary function/ministerial task'
dichotomy. ... [F]or purposes of qualified immunity, a governmental actor engaged in purely
ministerial activities can nevertheless be performing a discretionary function."  *Holloman*, 370
F.3d at 1265.

duties, and actions within the scope of their authority.[61]  On that basis, the Court readily concludes that the Sheriff's Defendants have satisfied their burden of demonstrating that they were engaged in discretionary functions at all times material hereto.

   2. *The "Clearly Established" Element.*

 "Once the official has established that he was engaged in a discretionary function, the plaintiff bears the burden of demonstrating that the official is not entitled to qualified immunity." *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004); *Holloman*, 370 F.3d at 1267 (to satisfy its burden, plaintiff must demonstrate that reasonable jury could interpret record evidence as showing that defendant violated a clearly established constitutional right).  In this context, courts examine whether the defendant's conduct "violated a clearly established constitutional right" of which a "reasonable government official would have been aware." *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001); *see also Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005) (official performing discretionary function is barred from qualified immunity if evidence in light most favorable to plaintiff shows that official's conduct violated clearly established constitutional right).  To resolve this issue, a court must first ask whether, taken in the light most favorable to the plaintiff, the evidence shows that the official's conduct violated a constitutional right.  *See Harris*, 433 F.3d at 811.  If that question is answered negatively, then the analysis ends and qualified immunity applies.  *Id.*  If, however, the question is answered affirmatively, then the court reaches the follow-up query of "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law."  *Id.*  An affirmative answer to this question precludes qualified

---

  [61]  For example, arrests lie within law enforcement officers' discretionary functions, as a matter of law.  *See, e.g., Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (deputy who arrested plaintiff was engaged in discretionary function because making arrests fell within his official responsibilities); *Burdeshaw v. Snell*, 365 F. Supp.2d 1194, 1198 (M.D. Ala. 2005) ("An on-duty police officer making an arrest is performing a discretionary function.").  The same rationale applies to the deputies' alleged crowd-control activities during the destruction of plaintiffs' property, as the duty of managing and containing large groups of potentially unruly spectators is a classic example of a traditional law enforcement function.

immunity, while a negative answer clinches qualified immunity.[62]

The § 1983 causes of action in the Complaint identify a plethora of constitutional and non-constitutional rights that plaintiffs claim were infringed by defendants.  Count I alleges that the Sheriff's Defendants violated plaintiffs' rights to "[f]reedom from illegal seizure of her property," "[f]reedom from illegal detentions," "[f]reedom from humiliation and intimidation and harassment," freedom from deprivation of liberty and property without due process of law, "[e]qual protection of the law," "[f]reedom from invasion of privacy," and the right to "[e]arn a living without illegal interference" (Complaint, ¶ 22).  Count II contends that defendants' conspired to deprive plaintiffs of various rights, including the right "to own, inherit and hold property," the right "to fair and equitable trial," the right "not to be deprived of liberty and property without due process of law," "the rights reserved or retained under the 9th and 10th Amendment," and the right "to equal protection of the laws" (Complaint, ¶ 28).  Count IV does not allege any additional constitutional violations, but instead rests on due process and equal protection theories of wrongdoing.

Although the Complaint identifies a wide-ranging palette of constitutional deprivations, plaintiffs disregard most of them in endeavoring to establish that the Sheriff's Defendants' acts and omissions violated clearly established constitutional rights of which reasonable government officials would have been aware.  In fact, plaintiffs' brief identifies but a single constitutional right allegedly violated by the Sheriff's Defendants that they claim meets the "clearly established" requirement and overcomes the qualified immunity defense.  (See doc. 105, at 6-10.)  Specifically, plaintiffs contend that they had a clearly established Fourth Amendment right to freedom from unreasonable seizure of their personal property, and that the Sheriff's Defendants violated that right via the following conduct: (i) ejecting the plaintiffs from the Property in January 2002, (ii) refusing to allow plaintiffs to remove their personal property at the time of the ejection even though the applicable court order purportedly "instructed them to eject

---

[62]       The Eleventh Circuit counsels that  "[a] constitutional right is clearly established if controlling precedent has recognized the right in a concrete and factually defined context." *Chesser*, 248 F.3d at 1122 (citation omitted); *see also Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1305 (11th Cir. 2005) ("A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent.").

the plaintiffs with their personal property," (iii) informing plaintiffs that it was too late to get their personal property, and that they would be arrested if they returned,[63] (iv) arresting plaintiffs for trespass when they returned to the Property on September 18, 2002, (v) being present on September 24, 2002 when other defendants were burning, taking and destroying plaintiffs' property, and (vi) telling plaintiffs and others not to interfere with the destruction of plaintiffs' property on September 24, 2002.  (Doc. 105, at 9-10.)[64]

The Sheriff's Defendants endeavor to rebut plaintiffs' showing in two respects.  First, they vigorously deny that the Fourth Amendment has any place in the qualified immunity analysis because, they maintain, "the Hoseas advance no claims under the Fourth Amendment." (Doc. 82, at 2; *see also* doc. 108, at 1.)  This contention is baseless.  The Jurisdiction paragraph of the Complaint specifically invokes the "First, **Fourth**, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments."  (Complaint, at 1 (emphasis added).)  Count I specifically alleges that "[e]ach of the defendants separately and in concert deprived plaintiff of plaintiff's right to ... [f]reedom from illegal seizure of her property."  (*Id.*, ¶ 22(a).)  No magic language is required to assert a Fourth Amendment basis for § 1983 relief, and plaintiffs' pleading is clearly sufficient in this respect.

Second, the Sheriff's Defendants assert that there can be no violation of plaintiffs' Fourth Amendment rights because the record demonstrates that they had abandoned their personal property.  (*See* doc. 108, at 8-9.)  The law is clear at both the federal and state levels that a person enjoys no Fourth Amendment protection for personal property that she has abandoned.

---

[63]    Items (i) through (iii) are time-barred pursuant to the analysis set forth in Section V.A., *supra*, and therefore are not properly considered in the qualified immunity analysis.

[64]    Plaintiffs liken these facts to *Soldal v. Cook County, Ill.*, 506 U.S. 56, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), in which the Supreme Court held that plaintiffs sufficiently stated a cause of action under § 1983 for deprivation of their Fourth Amendment rights where deputy sheriffs and mobile home park officials dispossessed plaintiffs of their mobile home by physically tearing it from the foundation and towing it to another lot, all without an eviction order.  Although *Soldal* generally supports the premise that a property owner's Fourth Amendment rights are violated when law enforcement interferes with his possessory interests in his property, it is readily distinguishable here based on the abandonment issue discussed *infra*, as well as on the fact that, unlike in *Soldal*, a valid eviction order was entered in this case.

*See, e.g., Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) ("There can be nothing unlawful in the Government's appropriation of ... abandoned property"); *United States v. Richards*, 638 F.2d 765, 770 (5th Cir. 1981) ("a defendant cannot challenge the search or seizure of abandoned property").[65]  This question thus becomes the focal point of the qualified immunity analysis.  If the Hoseas' personal property is classified as "abandoned" at the time of its alleged wrongful seizure, then plaintiffs lack a protectable Fourth Amendment interest in that property and the Sheriff's Defendants are entitled to qualified immunity on the § 1983 claims.  If not, then the analysis must proceed to whether a reasonable government official should have known that plaintiffs enjoyed a clearly established Fourth Amendment right as to the items of personal property in dispute here.

How then does one ascertain whether property is properly deemed "abandoned"?  Two distinctly different methodologies present themselves, neither of which have been briefed or otherwise addressed in the parties' voluminous summary judgment submissions.  The first possibility would be to navigate the esoteric and enigmatic seas of Alabama's law of ejectment, in an effort to ascertain whether the Hoseas continued to possess legal title to their personal property in the wake of the November 27, 2001 court order ejecting them from the homestead.  Under Alabama law, "[e]jectment is a favored action for the trial of title to land."  *Muller v.*

---

[65]  *See also United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005) ("When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it."); *United States v. Robinson*, 390 F.3d 853, 873-74 (6th Cir. 2004) ("If property has been 'abandoned' in this sense, the Fourth Amendment is not violated through the search or seizure of this property."); *United States v. James*, 353 F.3d 606, 615-16 (8th Cir. 2003) (warrantless search of abandoned property implicates no Fourth Amendment concerns); *United States v. Gulledge*, 469 F.2d 713, 715 (5th Cir. 1972) ("It is clear that the personal right to Fourth Amendment protection of property against search and seizure is lost when that property is abandoned."); *Martin v. State*, --- So.2d ----, 2003 WL 21246587, *6 (Ala.Crim.App. May 30, 2003) (individual has no Fourth Amendment protection if he abandoned premises before objected-to search); *Thompson v. State*, 680 So.2d 1014, 1016 (Ala.Crim.App. 1996) ("When individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have," such that warrantless seizure of such property is not unreasonable under Fourth Amendment).

*Seeds*, --- So.2d ----, 2005 WL 1594842, *2 (Ala. July 8, 2005).[66]  Perhaps fortunately for all concerned, federal appeals courts have unequivocally renounced this technique for analyzing abandonment in the Fourth Amendment context, decreeing that "arcane concepts of property law do not control an individual's ability to claim Fourth Amendment protection."  *United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994); *see also United States v. Edwards*, 441 F.2d 749, 753 (5th Cir. 1971) (explaining that subtle distinctions of private property law cannot be imported into the law of constitutional search and seizure, and that Fourth Amendment should be applied with a common-sense approach, not in hypertechnical manner); *United States v. Fulani*, 368 F.3d 351, 354 (3rd Cir. 2004) (Fourth Amendment abandonment analysis does not consider a plaintiff's property interest, but instead focuses on his reasonable expectation of privacy); *United States v. Thomas*, 864 F.2d 843, 845 (D.C. Cir. 1989) ("it is possible for a person to retain a property interest in an item, but nonetheless to relinquish his or her reasonable expectation of privacy in the object").  Accordingly, this Court need not and will not explore whether, as a matter of Alabama law, the Hoseas had a continuing property interest in the personal property at the time of its alleged seizure.[67]

In lieu of Alabama's law of ejectment, the Court aligns its compass with those precedents

---

[66]      To prevail on an ejectment action under Alabama law, a plaintiff shows legal title to the property, a right to immediate possession, and proof of a demand for and refusal to deliver possession.  *Id.* at *2.  "It is well settled that a plaintiff in an ejectment action can only recover when he has legal title to the property, the possession of which is sought to be recovered."  *Thomas v. Benefield*, 494 So.2d 452, 453 (Ala.Civ.App. 1986); *see also Enterprise Lodge No. 352 of Knights of Pythias, Inc. v. First Baptist Church (Colored) of Evergreen*, 264 So.2d 153, 154 (Ala. 1972) (plaintiff cannot recover in an ejectment action unless it held legal title when the suit was commenced and on to the time of trial); *Williams v. Kitchens*, 74 So.2d 457, 463 (Ala. 1954) (indicating that right and title to houses constituting permanent attachments to real property may be adjudicated in ejectment actions).  Alabama litigants may utilize an action in the nature of ejectment "not only as an efficient means for the adjudication of the right to possession, but also as a favored action for the trial of the legal title to land, that action being similar in nature to both an action in trespass and an action to quiet title."  *MacMillan Bloedell, Inc. v. Ezell*, 475 So.2d 493, 497 (Ala. 1985).

[67]      That legal question will presumably figure prominently in any analysis of plaintiffs' state-law claims for conversion and theft (Counts V and VI) against defendants Ledkins, Ms. Ledkins, Rogers, Fuller and McDonald.

declaring that the Fourth Amendment abandonment inquiry turns on whether an individual has maintained a reasonable expectation of privacy in the items searched or seized at the time of such search or seizure.  In that regard, "[t]he test of whether a defendant abandoned property is whether the defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search."  *United States v. Edwards*, 644 F.2d 1, 2 (5th Cir. 1981) (citation omitted); *see also United States v. Lehder-Rivas*, 955 F.2d 1510, 1522 (11th Cir. 1992) (same); *United States v. McKennon*, 814 F.2d 1539, 1546 (11th Cir. 1987) ("Whether an abandonment has occurred is a question of intent which can be inferred from words, acts and other objective facts.").  This determination must be made by reference to objective standards. *See Thompson*, 680 So.2d at 1016; *Thomas*, 864 F.2d at 846.

        The undisputed, objective facts in the summary judgment record demonstrate that as of September 2002 the Hoseas no longer maintained any reasonable expectation of privacy in the personal property at issue.[68]  Plaintiffs' real property (*e.g.*, the land and buildings where the personal property at issue was stored) was sold to Ledkins in August 2000, more than two years before the seizure took place.  Despite notice of the sale of the Property to pay off the *Baugh* judgment, the Hoseas neither left the land nor made arrangements to remove their personal property.  When the Hoseas refused to leave, Ledkins filed an unlawful detainer action in state court in 2001, seeking an order evicting plaintiffs from the Property.  Despite notice of the unlawful detainer action, the Hoseas elected not to appear or to defend against Ledkins' claims. Ultimately, a default judgment was entered against the Hoseas.  In November 2001, some ten months before the alleged seizure occurred, Marengo County District Judge Wade Drinkard entered an Order directing the Hoseas "to immediately vacate said real property of the Plaintiff, Michael E. Ledkins," and authorizing the Sheriff's Department "to restore the real property in question to [Ledkins] by removing the person and the property of the [Hoseas] from his

_____

[68]        To the extent that the Hoseas are seeking to recover against the Sheriff's Defendants under 42 U.S.C. § 1983 for a seizure of property occurring in January 2002 or February 2002, those claims are time-barred for the reasons explained in Section V.A.3., *supra*. For that reason, the qualified immunity analysis hinges on the alleged seizure of September 2002, and not on that of seven or eight months earlier.

premises." (Doc. 104, at Exh. I.)  The Hoseas received actual notice of Judge Drinkard's Order shortly after it was entered, but opted not to comply or to remove their personal belongings from what was now the Ledkins' real property.[69]  Two months later, in January 2002, Deputy Keith Jordan paid the Hoseas a visit, providing them with a copy of Judge Drinkard's Order and cautioning them that Sheriff's Deputies would escort them from the Property if they did not leave and take their personal belongings with them.  Rather than making arrangements to pack and move their personal property, the Hoseas informed Deputy Jordan that they were not leaving and imparted a thinly veiled threat that he should not attempt to evict them by himself.

Virtually the entire Marengo County Sheriff's Department visited the property on January 25, 2002 for the purpose of evicting plaintiffs.[70]  The Hoseas were removed from the wooden family residence at that time, and the locks were changed, with all of the Hoseas' personal property in the house being left behind.[71]  There is no evidence that the Hoseas ever sought to recover their personal property during the eight months following their eviction.  Indeed, the Hoseas have offered no evidence that they ever contacted Sheriff Langley or any other public official after January 25, 2002 to request access to the family residence to remove their personal property.  They have similarly come forward with no testimony or evidence that

---

[69]     Nor did the Hoseas submit any court filings seeking amendment, alteration or vacatur of Judge Drinkard's Order.  By all appearances, plaintiffs simply ignored it.

[70]     Judge Drinkard's Order plainly conferred upon them the authority to do just that.  More generally, under Alabama law, "[i]n the execution of the writ of possession, it is the generally accepted rule that the defendant and all the members of his family, together with his servants, employés and his tenants at will or sufferance, may be removed from the premises." *Slaughter v. Tatum*, 119 So. 651, 651 (Ala. 1928).

[71]     Plaintiffs emphatically assert that the Sheriff's Deputies' conduct violated Judge Drinkard's Order because that Order had instructed them to remove the Hoseas' personal property.  (*See* doc. 105, at 7-9.)  This contention is mistaken.  Judge Drinkard's Order did not order the Sheriff to remove plaintiffs' personal property, but instead merely authorized them to do so.  More generally, plaintiffs can impute no wrongdoing to the Sheriff's Defendants for failing to move plaintiffs' personal property for them.  As one court has observed, "[a] writ of possession for realty does not constitute the sheriff a furniture mover. The writ has been obeyed when the person or persons designated by the writ have been placed in peaceful possession of the premises. The disposition of personalty found on the premises is not the duty of the officer." *Kelton v. Vandervort*, 707 S.W.2d 517, 520 (Tenn.App. 1985).

they ever approached the new owner to request permission to remove their personal property. They initiated no legal action to recover such property. And they did not pursue any self-help remedies to collect and remove their personal belongings. Instead, the Hoseas simply left those items on the property for eight months, without ever lifting a finger to try to recover them or making inquiries of law enforcement officers, judicial authorities or the new owner as to whether they would be permitted to do so. The Hoseas offer no facts that they <u>ever</u> intended to retrieve those articles of personal property from the house and surrounding environs, much less that they ever took any steps to initiate such a recovery. These facts trace out a classic case of abandonment for Fourth Amendment purposes. In that regard, the case of *In re Kerlo*, 311 B.R. 256 (Bkrtcy. C.D. Cal. 2004), is instructive. In *Kerlo*, a debtor filed a bankruptcy petition, after which a court ordered the debtor to surrender her residential property to the trustee in vacant condition. Yet the debtor refused to leave, prompting the trustee to seek a writ of ejectment and a writ of possession. The bankruptcy court entered such writs, prompting the debtor to complain that her Fourth Amendment rights were being violated because she still had personal property at the residence. The *Kerlo* court explained that, in the wake of the order requiring her to surrender the residence to the trustee, the debtor no longer had a legitimate expectation of privacy with respect to the residence. Because of that, the court reasoned, "any personal items left on the Property constitute abandoned property for the purposes of the Fourth Amendment," such that removal of such personal items by the trustee could not implicate debtor's Fourth Amendment rights. *Id.* at 266-67. The Court finds the *Kerlo* reasoning persuasive on the question of abandonment.[72]

---

[72]     *See also United States v. Diggs*, 649 F.2d 731 (9th Cir. 1981) (defendant abandoned personal property where he left his motel room owing considerable back rent, mailed key to motel management, at no time attempted to retrieve property left in room, and where search was performed more than two months later); *United States v. De Parias*, 805 F.2d 1447, 1458 (11th Cir. 1986) (defendant's constitutional rights were not implicated by seizure of his clothing in apartment, where he had previously abandoned the property); *Lehder-Rivas*, 955 F.2d at 1522 (defendant abandoned suitcase that he had promised to retrieve for more than a year, such that he had no constitutional interest in its search or seizure); *Martin*, 2003 WL 21246587, at *7 (defendant abandoned footlocker and contents when he left them in patrol car upon resigning as state trooper, then moved out of state); *People v. Taylor*, 655 N.W.2d 291, 297-98 (Mich.App. 2002) (defendant had no reasonable expectation of privacy in house entitling him to

The Hoseas may or may not have retained an ownership interest in their personal belongings, as a matter of Alabama law.  Regardless of whether they maintained such an interest, however, the record overwhelmingly establishes that the Hoseas no longer held a reasonable expectation of privacy with regard to those items as of September 2002, and that they had voluntarily relinquished and abandoned their interest in that personal property.[73]  Although they had known for more than a year that they would have to leave the family home, and although they received escalating warnings of their impending eviction, the Hoseas made no attempt to move their property prior to January 25, 2002.  After the January 25, 2002 eviction, plaintiffs never initiated inquiries or endeavors to retrieve their property.  The Hoseas could not reasonably have expected Ledkins to maintain and store their personal property for them indefinitely, waiting for them to make arrangements to pick it up.  To hold that they continued to hold a reasonable expectation of privacy in these circumstances would be to excise the doctrine of abandonment from Fourth Amendment jurisprudence.  This the Court will not do.

For all of the foregoing reasons, and considering the record in the light most favorable to plaintiffs, the Sheriff's Defendants' conduct did not violate the Hoseas' Fourth Amendment rights because the Hoseas had no reasonable expectation of privacy in the personal property

---

Fourth Amendment protection where external appearance and condition of house gave rise to reasonable inference of abandonment); *Commonwealth v. Lanigan*, 423 N.E.2d 800, 801-02 (Mass.App.Ct. 1981) (trial judge properly found no legitimate expectation of privacy where defendant had previously abandoned apartment, which had been padlocked by police and from which defendant had fled the state to avoid capture); *Graves v. State*, 489 S.W.2d 74, 85 (Tenn.Crim.App. 1972) (defendant lost expectation of privacy by leaving apartment without notice, without paying rent, and without removing personal articles).

[73]      In reaching this conclusion, the Court is cognizant of the strand of authorities holding that "abandonment of an item as a result of illegal police conduct is not a voluntary abandonment for Fourth Amendment purposes."  *Atwell v. State*, 594 So.2d 202, 209 (Ala. Crim.App. 1991); *see also Ford v. State*, 680 So.2d 948, 951 & n.1 (Ala.Crim.App. 1995) (observing that abandoned property does not fall outside Fourth Amendment protection if the abandonment was product of unlawful police conduct).  There is no evidence, however, that the Sheriff's Defendants' eviction of plaintiffs on January 25, 2002 pursuant to Judge Drinkard's Order was unlawful.  Even if it were, the abandonment at issue here was not the result of the Hoseas' eviction, but instead followed from the Hoseas' ensuing failure to undertake to retrieve their personal belongings for eight months post-eviction.

seized.  That being the case, and plaintiffs having identified no other viable bases for satisfying their burden of showing a violation of a clearly established constitutional right, the Court concludes that the Sheriff's Deputies are entitled to qualified immunity as to plaintiffs' claims under 42 U.S.C. § 1983.[74]

Plaintiffs' attempts to rebuff the qualified immunity defense are not resuscitated by their conclusory comment that "[o]n September 24, 2002, the law was clearly established that the defendants [*sic*] action violated the plaintiffs [*sic*] due process rights."  (Doc. 105, at 10.) Simply including a solitary, throwaway reference to the words "due process" in the qualified immunity section of their brief falls far short of satisfying plaintiffs' burden of showing a violation of a clearly established constitutional right.  Besides, it defies logic and common sense to suggest that there was a clearly established constitutional right for the Hoseas to receive <u>more</u> process before their personal property was removed or destroyed.  When legal proceedings were initiated in state court to evict them from the Property, plaintiffs disregarded them, and a default judgment was entered.  Not only did plaintiffs decline to participate in those proceedings, but they defied the court order directing them to vacate the premises immediately.  When a Sheriff's Deputy notified them that they would be evicted pursuant to Judge Drinkard's Order, plaintiffs obstinately planted their feet and warned the deputy not to try to evict them himself.  Following their eviction, plaintiffs abandoned their personal belongings and did not undertake any efforts to retrieve such property for eight months.  Upon review of these facts, the obvious question is this: What additional process was due before plaintiffs' personal property could be removed?

---

[74]     Even if plaintiffs had made an adequate showing that the Sheriff's Defendants' conduct violated their Fourth Amendment rights, which they did not, they could overcome the qualified immunity defense only by also showing that "at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law."  *Harris*, 433 F.3d at 811.  Plaintiffs have come forward with no evidence or argument that might enable them to satisfy this aspect of their qualified immunity burden.  Stated differently, even if plaintiffs did have a protectable Fourth Amendment right in their personal property that they had left in and around the family homestead to accumulate dust for the previous eight months, plaintiffs have made no showing that every objectively reasonable law enforcement agent would have recognized their continuing Fourth Amendment interest in that property.  Therefore, it is the Court's assessment that plaintiffs can meet neither the "constitutional violation" nor the "clearly established" prongs of their burden to defeat the qualified immunity defense.

Plaintiffs do not answer, elaborate or explain their position, much less delineate the relevance of due process concepts in the "clearly established" analysis.[75]  For all of these reasons, the Court finds that the Hoseas have failed to show that the Sheriff's Defendants' conduct in September 2002 violated clearly established constitutional rights to procedural due process.

Finally, the Court recognizes that in other portions of their Complaint and brief, the Hoseas trumpet constitutional theories of recovery against the Sheriff's Defendants on the basis of alleged equal protection violations, takings without just compensation, Ninth Amendment violations, Tenth Amendment violations and Fourteenth Amendment violations.  However, plaintiffs elected not to rely on any of these arguments in opposing the qualified immunity defense.  Instead, plaintiffs' counsel made a strategic decision to focus their qualified immunity argument on the Fourth Amendment aspect.  Having made such a decision, plaintiffs must now lie in the bed they have made.  This Court will not wield plaintiffs' burden for them by launching a *sua sponte* investigation into whether any other possible bases exist for plaintiffs to defeat the qualified immunity defense, or whether any in the laundry list of rights cited by the Hoseas could be deemed both violated and clearly established in the context of the facts of this case.  *See, e.g., Lyes*, 126 F.3d at 1388 (explaining that "the onus is on the parties to formulate arguments" in Rule 56 proceedings); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*,

---

[75]     At best, plaintiffs theorize that the Sheriff's Defendants "violated the plaintiff [*sic*] due process rights by preventing the plaintiffs from taking action to get their personal property, and restraining them while their property was being taken, burned and destroyed.  Also, when the Sheriff's Defendants took possession and control of the Hoseas' property, they had a duty of care to make sure nothing happen [*sic*] to the property."  (Doc. 105, at 22.)  All three of these accusations are factually unsupported by the record.  There is no evidence that the Sheriff's Defendants prevented the Hoseas from recovering their personal property; to the contrary, there is no indication in the record that the Hoseas ever attempted such a recovery.  Second, there is no evidence of the Sheriff's Defendants "restraining" the Hoseas while their property was taken, burned and destroyed.  The Hoseas point to no evidence that any of them engaged in any conduct in September 2002 to stop the ransacking of their property, much less that Sheriff's Defendants "restrained" them from doing so.  Third, although plaintiffs accuse the Sheriff's Defendants of taking possession and control of plaintiffs' personal property, there is no evidence that they did so.  Merely because the Sheriff's Defendants changed the lock on the family residence does not mean that those defendants assumed possession and control of its contents.  Because the Hoseas' due process theory is founded on facts not in the record, they cannot credibly challenge defendants' qualified immunity defense on due process grounds.

-53-

219 F.3d 1301, 1326 (11th Cir. 2000) (party's failure to brief and argue issue before district court is ground for declaring it abandoned); *McMaster v. United States*, 177 F.3d 936, 940-41 (11th Cir. 1999) (noting that a claim may be considered abandoned when it is included in complaint, but plaintiff fails to argue it to district court); *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999) (discussing "unremarkable proposition that assertions made in the pleadings ..., but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion"); *Laborers' Int'l Union of North America v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions.").

For all of the foregoing reasons, the Court concludes that the Sheriff's Defendants are entitled to qualified immunity on plaintiffs' § 1983 causes of action.  Those claims are hereby **dismissed**.[76]

### D.    *Plaintiffs' Claims Under 42 U.S.C. §§ 1982 and 1985.*

Plaintiffs' remaining causes of action against the Sheriff's Defendants sound under 42 U.S.C. §§ 1982 and 1985.  The Court will address them in reverse order.

#### 1.    *Conspiracy Claim under 42 U.S.C. § 1985.*

Count IV of the Complaint charges defendants with conspiring to violate the Hoseas' civil rights in violation of 42 U.S.C. § 1985.  The only subsection of § 1985 which could possibly apply here is § 1985(3), which outlaws, *inter alia*, conspiracies to deprive a person or class of persons of equal protection of the laws.  The Sheriff's Defendants first argue that this claim is subject to qualified immunity, just as the § 1983 claims were. (*See* doc. 82, at 21-22; doc. 108, at 6.)  This contention is ill-conceived, as binding precedent precludes application of qualified immunity in the § 1985(3) context.  As the Eleventh Circuit explained, "[w]e have squarely held that qualified immunity is not available as a defense to a § 1985(3) claim, see

---

[76]    This determination applies with equal force to plaintiffs' substantive § 1983 claim set forth at Count I and their § 1983 conspiracy claims delineated in Counts II and IV of the Complaint.  *See, e.g., Burrell v. Board of Trustees of Ga. Military College*, 970 F.2d 785, 793 (11th Cir. 1992) (concluding that governmental defendants were entitled to qualified immunity as to plaintiff's § 1983 conspiracy claim).

*Burrell v. Board of Trustees of Ga. Military College*, 970 F.2d 785, 794 (11th Cir. 1992), and are not swayed by the defendants' argument that *Burrell* is no longer legally viable." *Johnson v. City of Fort Lauderdale, Fla.*, 126 F.3d 1372, 1379 (11th Cir. 1997); *see Young v. SouthTrust Bank, N.A.*, 51 F. Supp.2d 1274, 1285 (M.D. Ala. 1999) ("Under the law of this circuit, the doctrine of qualified immunity is not applicable in cases brought under Section 1985(3).").  Clearly, then, qualified immunity can afford the Sheriff's Defendants no relief on the § 1985(3) claim.

   In the absence of qualified immunity, the Sheriff's Defendants' fallback position on the § 1985(3) cause of action is that the record does not show that they reached an understanding with any of the private defendants, and even if it did, there is no evidence that the purpose of the conspiracy was to deprive the Hoseas of equal protection of the laws.[77]  "The elements of a cause of action under section 1985(3) are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States."  *Trawinski v. United Technologies*, 313 F.3d 1295, 1299 (11th Cir. 2002); *see also Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627-28 (11th Cir. 1992) (same).  In outlining these prerequisites, the Eleventh Circuit has reasoned that "[t]he purpose of § 1985 was to stifle the serious class-based deprivation of constitutional rights by private parties, not to serve as a general federal tort law, and, as such, a claim under § 1985(3) requires the proof of invidious discriminatory intent as well as the

---

[77]  The Sheriff's Defendants also seek refuge under the shelter of the intracorporate conspiracy doctrine, which provides that employees within the same public entity cannot, as a matter of law, conspire among themselves in a manner violative of § 1985(3), inasmuch as all of their activities within the course of their employment are attributable to the public entity itself. *See, e.g., Denney v. City of Albany*, 247 F.3d 1172, 1190-91 (11th Cir. 2001); *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1037-38 (11th Cir. 2000); *Dickerson v. Alachua County Com'n*, 200 F.3d 761, 768 (11th Cir. 2000) (construing intracorporate conspiracy doctrine to find that "the County jail and its employees are considered to constitute a single legal entity that cannot conspire with itself").  Had the Hoseas alleged merely that the Sheriff's Defendants conspired with each other to violate their equal protection rights, then this argument might hold some allure.  But a fair reading of the Complaint is that plaintiffs charge the Sheriff's Defendants of conspiring with Ledkins, McDonald, Rogers and Fuller to engage in the deprivations at issue.  Thus, the intracorporate conspiracy doctrine has no relevance here.

violation of a serious constitutional right protected not just from official, but also from private encroachment." *Trawinski*, 313 F.3d at 1299.  With respect to the discriminatory intent element, a plaintiff must show "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Lucero*, 954 F.2d at 628.

The Hoseas' theory of relief under § 1985(3) is never articulated in the pleadings and briefs, and is therefore difficult to discern.  Evidently, the Hoseas contend that the Sheriff's Defendants conspired with Ledkins, McDonald, Rogers and Fuller to spirit away plaintiffs' personal belongings, for future allocation among themselves.  Plaintiffs allege that "[t]he Sheriff Department was involved in the taking and burning of the plaintiffs' property," and that there must have been "an understanding between the Sheriff's Department and the other defendants, when the Sheriff Deputies appeared to prevent any interfere [*sic*] with the taking of the plaintiffs' property."  (Doc. 105, at 17.)  To bolster such allegations, plaintiffs point to evidence that "the Sheriff Deputies stated that they were present to prevent anyone from interfering with the the taking of the property by the defendant," presumably meaning Ledkins, Rogers, Fuller and McDonald.  (*Id.* at 26.)  Plaintiffs speculate that Ledkins "could have been putting the property in storage for the Sheriff," but proffer no evidence in support of such a theory.  (*Id.* at 13.) Plaintiffs contend that there must be "a genuine issue of material fact as to whether the [Sheriff's D]efendants took the property," inasmuch as those defendants deny it; however, plaintiffs identify no countervailing evidence to cast doubt on the Sheriff's Defendants' denials.  (*Id.*)

When the fog is dispelled and the record is studied in the light most favorable to the Hoseas, this is the evidence of a conspiracy between the Sheriff's Defendants and the private defendants.  On September 24, 2002, the private defendants removed and destroyed various items of personal property of the Hoseas.  Several Sheriff's Deputies were on the scene, along with dozens of spectators.  The Deputies indicated that they were there to prevent onlookers from interfering with the activities of the private defendants.  When certain of the spectators objected, the Deputies stated that they would be taken to jail if they did not desist.  The record is devoid of other evidence supporting the existence of the purported conspiracy.

This showing is far too slender a reed to create a genuine issue of material fact as to the existence of a conspiracy between the Sheriff's Defendants and the private defendants.  The Hoseas do "not have to produce a "smoking gun" to establish the "understanding" or "willful

participation" required to show a conspiracy." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002). Nonetheless, it is incumbent on them to "show some evidence of agreement between the defendants." *Id.* at 1284; *see also Bailey v. Bd. of County Comm'rs of Alachua County, Fla.*, 956 F.2d 1112, 1122 (11th Cir. 1992) ("The linchpin for conspiracy is agreement, which presupposes communication."); *Belfast v. Upsilon Chapter of Pi Kappa Alpha Fraternity at Auburn University*, 267 F. Supp.2d 1139, 1146-47 (M.D. Ala. 2003) (conspiracy claim under § 1985(3) requires plaintiff to show agreement between members, and while evidence may be circumstantial, there must be some indication that defendants were acting in concert pursuant to an agreement to act against plaintiff's rights). The Eleventh Circuit has cautioned that a conspiracy claim cannot withstand Rule 56 scrutiny on the basis of a mere scintilla of evidence. *See Rowe*, 279 F.3d at 1284. Here, plaintiffs have shown no evidence of an agreement or understanding or willful participation between the Sheriff's Defendants and the private defendants. There is no evidence of any communication between or among the two sets of defendants, other than Ledkins complaining to the Sheriff's Department in January 2002 that the Hoseas were still on the Property and in September 2002 that the Hoseas were trespassing. There is no evidence that the Sheriff's Defendants' presence at the scene on September 24, 2002 was prompted by anything other than a desire to maintain order at a potentially volatile event that was teeming with onlookers and that might reasonably be expected to inflame emotions. And there is certainly no evidence that the Sheriff's Deputies received or were promised any of the "loot" procured by the private defendants. No reasonable inference could be drawn from the record that the private defendants and Sheriff's Defendants were collaborating or cooperating on a nefarious plot to strip the Hoseas of their property. Nor does the mere presence of Sheriff's Deputies at the scene of the alleged wrongdoing give rise to an inference of agreement or willful participation on their part. Simply put, the Hoseas ask the Court to allow their conspiracy claims to reach a jury on the basis of conjecture, surmise, and guesswork. But all the speculation in the world cannot obscure the fact that plaintiffs have no evidence of the requisite "understanding" or "willful participation" necessary to establish liability on a § 1985(3) conspiracy claim.[78]

---

[78]     The Court recognizes that plaintiffs' difficulties in proving their case stem at least in part from their failure to depose defendants or defense witnesses, and their limited use of

Even if the Hoseas had made an adequate showing of a conspiracy, which they have not, their § 1985(3) claim would still fail because there is no evidence of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Lucero*, 954 F.2d at 628.  Plaintiffs protest that "[t]he Sheriff has not evicted white persons and taken their personal property."  (Doc. 105, at 23.)  But where is the evidence to support such a blanket statement?[79]  During discovery, plaintiffs certainly could have inquired of the Sheriff's Defendants whether they had evicted white citizens who were similarly situated to the Hoseas.  Because they did not ask the question, one can only guess as to whether the Hoseas were subjected to differential treatment by the Sheriff's Defendants.  Of course, guesswork cannot defeat a motion for summary judgment.  Plaintiffs point to no facts that the Sheriff's Defendants have ever declined to enforce a writ of ejectment entered against white citizens in Marengo County.  Plaintiffs point to no facts that Sheriff's Deputies have intervened to prevent the taking or destruction of long-abandoned property of white citizens of Marengo County.[80]  At most, the Hoseas weakly assert that they were treated differently than Ledkins, and that because Ledkins is white there is sufficient evidence of an invidiously discriminatory purpose to allow them to reach a jury.  (*See* Doc. 105, at 23-25.)  But Ledkins was not similarly situated to plaintiffs; therefore, the analogy falls flat.  Unlike Ledkins, the plaintiffs had been ordered by the Marengo County

---

paper discovery techniques.  The Court further recognizes that Magistrate Judge Cassady rejected the Hoseas' attempts to enlarge the discovery window to enable them to take additional discovery.  (*See* doc. 101.)  However, the pending summary judgment motions must be evaluated on the basis of the record actually furnished by the parties, not an uncharted, undeveloped record that might be theoretically possible.

[79]     It is no answer to point to the Declaration of Phil Ford, who avers that he has "never heard of a white person being put off his or her property," and thus that he believes "that race played a part."  (Ford Decl., ¶ 12.)  One witness's hypothesis and conjecture is not a substitute for credible, creditable summary judgment evidence.  And what Ford may or may not have "heard of" is not evidence that the Sheriff's Defendants treated the Hoseas differently than similarly situated white citizens of Marengo County.

[80]     Plaintiffs also overlook the fact that two of the four Sheriff's Defendants (and several of the private defendants) whom they accuse of racial discrimination are themselves African-American, including both Chief Deputy Reese (whom plaintiffs place at the center of the contested events) and Deputy Jones.  (M. Hosea Dep., at 23; Fleta Mae Hosea Dep., at 51.)

-58-

District Court to vacate the premises.  Unlike Ledkins, the plaintiffs had openly defied that court order, as well as instructions from law enforcement to leave and not come back.  Unlike Ledkins, the plaintiffs had abandoned personal property on their former homestead for eight months after their eviction, without ever requesting access to it.  Unlike Ledkins, the Hoseas were trespassers on land that an Alabama court had ruled no longer belonged to them.  Simply put, no inference of discriminatory intent can be drawn by comparing Ledkins' experience at the hands of the Sheriff's Defendants to that of the Hoseas.[81]

In light of the foregoing, the undersigned concludes that plaintiffs' claim in Count IV that defendants conspired to violate the Hoseas' civil rights, in violation of 42 U.S.C. § 1985(3), is due to be **dismissed** as to the Sheriff's Defendants because the record shows neither the existence of a conspiracy involving those defendants nor any basis for finding that any such conspiracy was motivated by invidious class-based discriminatory intent.

> ### 2.  *Discrimination Claims under 42 U.S.C. § 1982.*

In Count III of the Complaint, plaintiffs allege that defendants "were denied the peaceful ownership of their land by the defendants because plaintiffs are of African-American descent and race," in violation of 42 U.S.C. § 1982.  (Complaint, ¶ 33.)[82]  A plaintiff cannot succeed in a § 1982 claim without showing racial animus, intentional discrimination, and deprivation of the

---

[81]  Nor is the Hoseas' cause furthered by a particularly elusive bit of reasoning set forth in their opposition brief.  Plaintiffs argue: "In this case, one of the party [*sic*] is lying.  If the jury concludes that the defendants are lying about not taking and burning the Hoseas' property, the jury can make a rational infer [*sic*] that the defendants are lying to hide an improper motive in taking the property."  (Doc. 105, at 20.)  This contention is unpersuasive on at least two levels.  First, plaintiffs have proffered no evidence that the Sheriff's Defendants did take and burn the Hoseas' property.  One cannot prevail on summary judgment simply by branding the other side untruthful.  Second, plaintiffs take a vast logical leap in suggesting that if the Sheriff's Defendants were lying about taking and burning plaintiffs' property, that lie is itself evidence of a racially discriminatory motive.  This is a *non sequitur*.  If the Sheriff's Defendants did lie about the taking and burning of plaintiffs' property, the lie might show an intent to conceal their wrongful appropriation or destruction of private property, but the lie itself could not reasonably raise an inference of racial animus.

[82]  That statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property."  42 U.S.C. § 1982.

plaintiff's rights because of race.  *See, e.g., Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3rd
Cir. 2001); *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (plaintiff in § 1982 claim
must show membership in protected class, discriminatory intent, and interference with rights or
benefits connected with ownership of property); *McCoy v. Homestead Studio Suites Hotels*, 390
F. Supp.2d 577, 584 (S.D. Tex. 2005) (Section 1982 claim requires showing that defendants had
intent to discriminate on the basis of race); *Lawrence v. Courtyards at Deerwood Ass'n, Inc.*,
318 F. Supp.2d 1133, 1150 (S.D. Fla. 2004) (*prima facie* showing under § 1982 is that plaintiff
belongs to racial minority, that defendant intended to discriminate on basis of race, and that
discrimination concerned activities addressed in § 1982, such as right to buy and sell property).

The Hoseas' § 1982 claims against the Sheriff's Defendants fail for the same reason that
their § 1985(3) causes of action do, to-wit: The record is devoid of evidence that any of the
complained-of activities by the Sheriff's Defendants (or any defendants, for that matter) were
motivated by race-based animus.  Without evidence that the Sheriff's Defendants acted with a
racially discriminatory purpose, the § 1982 cause of action articulated in Count III cannot
proceed against the Sheriff's Defendants, and that claim is therefore **dismissed**.[83]

## VI.   Analysis of Rogers/Fuller Motion for Summary Judgment.

Having addressed the Sheriff's Defendants' dispositive motion, the Court now turns to
the Motion for Summary Judgment (doc. 92) submitted by defendants Rogers and Fuller.  This
very short Motion proffers a straightforward basis for dismissal, namely, that "there is not one
shred of evidence that Rogers and Fullers were involved in the events" being litigated here.
(Doc. 93, at 2.)  Movants elaborate that: (a) they were not involved in the unlawful detainer/
eviction proceedings; (b) they had nothing to do with plaintiffs' arrest for trespass or their
ensuing criminal prosecution; (c) they did not participate in any conspiracy; (d) being African-
American, they did not take any action against the Hoseas that was motivated by race
discrimination; (e) plaintiffs have no evidence that Rogers took part in the conversion or theft of

---

[83]      With this ruling, all claims against the Sheriff's Defendants in their individual
capacity have been dismissed with prejudice.  For that reason, the undersigned need not reach
the Sheriff's Defendants' alternative defense of quasi-judicial immunity.  Consideration of that
defense is not necessary to grant the Sheriff's Defendants the full measure of relief requested in
their Motion for Summary Judgment.

plaintiffs' property; and (f) Fuller has denied any such involvement.

    **A.**    *The State Law Claims.*

    Rogers and Fuller face an insurmountable obstacle in seeking summary judgment on Counts V and VI, the two state law causes of action alleging conversion and theft of plaintiffs' personal property.  Notwithstanding their earnest denials, there is ample evidence in the record from which a reasonable factfinder could conclude that Rogers and Fuller actually did convert and steal plaintiffs' property.  Several examples will demonstrate the point.  First, Rogers and Fuller candidly admit that, in response to discovery, plaintiffs stated that they had personal knowledge of Fuller taking their personal property, and that Fuller had told them he could take whatever he wanted.  (*See* doc. 93, at 2.)[84]  Second, Phil Ford avers that both Rogers and Fuller were present during the burning and taking of plaintiffs' property on September 24, 2002, and that he personally witnessed them pouring gasoline on mobile homes containing the Hoseas' personal belongings.  (Ford Decl., ¶¶ 6, 8.)  Third, Jimmy Figgers avers that Rogers boasted that he (Rogers) had removed property from the land that had formerly belonged to the Hoseas.  (J. Figgers Decl., ¶ 7.)  Fourth, Mollie Hosea stated in her declaration that she saw some of plaintiffs' personal property in Rogers' home and yard, and that when she confronted him about it, Rogers responded that he had been told to take whatever he wanted from the land that had formerly belonged to the Hoseas.  (M. Hosea Decl., ¶ 6.)  Fifth, Mollie testified that Rogers and Fuller assisted Ledkins in loading truckloads of plaintiffs' personal property in January 2002.  (M. Hosea Dep., at 47-49, 150-51.)  This and other record evidence plainly creates a genuine issue of material fact as to whether Rogers and Fuller may be liable to plaintiffs for conversion and theft.  *See generally SouthTrust Bank v. Donely*, --- So.2d ----, 2005 WL 1655003, *4 (Ala.

---

    [84]    In a remarkable bout of candor, Rogers and Fuller present this interrogatory response as the centerpiece of the "undisputed facts" section of their brief, without offering any inkling as to how Fuller might overcome it on summary judgment.  Simply proffering a denial from Fuller as to the veracity of that interrogatory response is inadequate to negate it.  Rather, Fuller's denial that he was in possession of plaintiffs' personal property merely creates a genuine issue of material fact, which must be resolved at trial.  At the Rule 56 stage, this Court cannot weigh credibility as between plaintiffs' contention that Fuller did take and possess their personal property, and Fuller's denial of same.  Resolution of such disputed facts is the *raison d'etre* of jury trials, and this Court cannot pretermit the process in the manner requested by Fuller.

July 15, 2005) (conversion requires proof of a wrongful taking, illegal assumption of ownership, illegal use or misuse of another's property, or wrongful detention or interference with another's property); *Riscorp, Inc. v. Norman*, 915 So.2d 1142, 1153 (Ala. 2005) (same). Accordingly, Rogers' and Fuller's Motion for Summary Judgment is **denied** as to the state-law causes of action against them, as set forth in Counts V and VI of the Complaint.[85]

      **B.**    ***The Federal Claims.***

      The federal claims against Rogers and Fuller rest on a different footing. Considering first the § 1983 causes of action, it is clear that Rogers and Fuller cannot invoke qualified immunity as a basis for dismissal of those claims in the manner that the Sheriff's Defendants did. *See Swann v. Southern Health Partners, Inc.*, 388 F.3d 834, 837 (11th Cir. 2004) (private entity is not entitled to assert qualified immunity defense to § 1983 claims); *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (no qualified immunity defense for privately employed prison physician); *Burrell*, 970 F.2d at 796 ("Private defendants who allegedly conspired with public officials to deprive another of her constitutional rights therefore are not entitled to qualified immunity under section 1983."). It is equally clear, however, that the Hoseas' § 1983 claims against Fuller and Rogers (including both substantive and conspiracy variants) cannot survive summary judgment in the absence of an adequate showing of conspiracy. After all, "section 1983 does not afford a remedy against a private person unless that person is shown to have conspired with one or more state actors." *Rowe*, 279 F.3d at 1285; *see also Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir. 1990) ("private defendants can be held liable in a § 1983

---

[85]    Rogers and Fullers opted not to advance the argument that Counts V and VI fail, as a matter of law, because the Hoseas lacked either legal title in the property at issue or a cognizable possessory interest in same. *See, e.g., Ex parte Anderson*, 867 So.2d 1125, 1129-32 (Ala. 2003) (observing that, in general, Alabama tort of conversion requires both general or specific title to the property and a possessory interest in the property, although in certain limited circumstances a possessory interest may itself be sufficient); *River of Life Christian Center v. River of Life Int'l, Inc.*, 894 So.2d 730, 732 (Ala.Civ.App. 2004) (gist of conversion action is wrongful exercise of dominion over property in exclusion or defiance of plaintiff's rights, where plaintiff has general or special title to property, or immediate right to possession). Rogers and Fuller not having argued or briefed the question of the Hoseas' continuing title or possessory rights, if any, in the personal property at issue in this litigation, the Court will not *sua sponte* embark on such a potentially thorny foray into Alabama law.

action if they act in concert with the state officials in depriving a plaintiff of constitutional rights"). If a § 1983 conspiracy claim against a private actor fails for want of evidence of conspiracy, then the substantive § 1983 claims against him necessarily fail as well. *See Rowe*, 279 F.3d at 1285. Fuller and Rogers maintain, with no elaboration, that there is no evidence of a conspiracy between themselves and any state actor.

Under applicable precedents, "[t]he plaintiff attempting to prove such a conspiracy must show that the parties 'reached an understanding' to deny the plaintiff his or her rights." *Bendiburg*, 909 F.2d at 468 (citation omitted); *see also Rowe*, 279 F.3d at 1283 (*prima facie* case of § 1983 conspiracy must show that defendants reached understanding to violate plaintiff's rights). As mentioned *supra*, no "smoking gun" is required to establish the requisite "understanding" or "willful participation," but there must be more than a scintilla of evidence of an agreement. *See Rowe*, 279 F.3d at 1283-84; *see also Bailey*, 956 F.2d at 1122 (11th Cir. 1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). To satisfy their burden, plaintiffs offer no evidence that Rogers and Fuller ever communicated, much less agreed with, the Sheriff's Defendants about anything. In fact, the only evidence to which plaintiffs point in support of the alleged conspiracy is the presence of several Sheriff's Deputies during the burning and taking of plaintiffs' property on September 24, 2002, and the Deputies' admonitions to the assembled onlookers not to interfere in the activities of Ledkins, Rogers, Fuller, and McDonald. As already stated in Section V.D.1., *supra*, such evidence is insufficient to enable a jury reasonably to find the existence of a conspiracy to violate the Hoseas' constitutional rights. Simply put, the record is devoid of evidence of the necessary "willful participation" or "understanding" as between Rogers and Fuller, on the one hand, and the Sheriff's Defendants, on the other. For that reason, the Court finds that the § 1983 conspiracy claims set forth in Counts II and IV of the Complaint are properly dismissed as to Rogers and Fuller. And, pursuant to *Rowe*, the lack of evidence of a conspiracy is likewise fatal to plaintiffs' substantive § 1983 claims in Counts I and II against those defendants.

The same reasoning informs the resolution of the § 1985(3) conspiracy cause of action set forth in Count IV of the Complaint. In the absence of genuine issues of material fact as to the existence of a conspiracy to deprive the Hoseas of equal protection of the laws, plaintiffs cannot reach a jury as to that claim. Moreover, the total lack of evidence of a racial motivation for any

of defendants' actions vis a vis the Hoseas and their property precludes plaintiffs' § 1982 claim set forth in Count III from moving forward as to Rogers and Fuller (who are themselves African-American).[86]

The foregoing analysis establishes that defendants Rogers and Fuller are entitled to summary judgment on all of plaintiffs' federal causes of action.  Accordingly, Rogers' and Fuller's Motion for Summary Judgment is **granted** as to Counts I through IV of the Complaint, but **denied** as to Counts V and VI.

**VII.    Status of Remaining Claims Against Remaining Defendants.**

The foregoing resolution of the summary judgment motions filed by the Sheriff's Defendants and defendants Rogers and Fuller raises significant questions about the status and future path of this litigation, and in particular the continuing propriety of a federal forum for this dispute.  All claims against the Sheriff's Defendants have been dismissed.  The federal claims against Fuller and Rogers have been dismissed.  Thus, in the absence of further judicial action, the only remaining claims are Counts V and VI (state law claims) against Fuller and Rogers, and Counts I through VI (state and federal claims) against defendants Ledkins, Ms. Ledkins and McDonald.  Because the Court is of the opinion that proceeding to trial in federal court on these causes of action would be grossly inefficient and would transform trial of the lingering federal claims into a mere charade, judicial intervention is warranted.

**A.    *Federal Claims as to Defendants Ledkins, Ms. Ledkins and McDonald.***

For reasons that are not obvious, counsel for defendants Ledkins, Ms. Ledkins and McDonald decided against filing a dispositive motion.  Indeed, they did not even attempt to ride the coattails of their fellow defendants by filing a notice that they joined in other defendants' Rule 56 filings.  This is so despite the fact that the § 1983, § 1985(3) and § 1982 claims against them proceed on exactly the same theories and suffer from exactly the same infirmities as those

---

[86]    In their brief, Rogers and Fuller maintain that there is "not one shred of evidence that Rogers or Fuller ... took any action that deprived the Plaintiffs of any rights in property that was motivated by racial discrimination."  (Doc. 93, at 3.)  Thus, plaintiffs were squarely on notice that defendants were challenging the racial component to their federal causes of action, such that it was incumbent upon them to present evidence of racial bias in their opposition memoranda.

against Rogers and Fuller.  Even though plaintiffs were on notice that certain defendants were contesting the existence of a § 1983 or § 1985 conspiracy, the summary judgment record includes no evidence creating a genuine issue of material fact as to whether there was willful participation or understanding as between the private defendants and the Sheriff's Defendants to violate plaintiffs' constitutional rights.  Even though plaintiffs were on notice that certain defendants disputed whether any evidence might support the equal protection / race discrimination allegations animating the § 1982 and § 1985(3) causes of action, the record is devoid of evidence of racial animus and intentional discrimination.

Under the circumstances, the Court perceives two options for handling the federal causes of action as to Ledkins, Ms. Ledkins and McDonald.  First, the Court could reflexively declare that those federal claims will proceed to trial because those three defendants neglected to move for summary judgment in accordance with the applicable Rule 16(b) Scheduling Order.  While perhaps having the virtue of expedience in the short term, this myopic approach would reap an inefficient, improvident outcome by burdening the litigants, the Court, the jury, and the judicial system with a trial on federal claims for which plaintiffs have been unable to marshal sufficient evidence in response to dispositive motions filed by other defendants.  The Hoseas' summary judgment responses demonstrate that they cannot establish either a conspiracy or a racial motivation as to any of their federal causes of action.  If they cannot do so now, after having the benefit of the discovery process and in the face of direct challenges from other defendants, then there is no reasonable probability that they will be able to do so at trial.  To ignore that inevitability and to set a trial on those federal claims because three defendants failed to file Rule 56 motions would be to condemn all involved to a futile endeavor trying federal claims that have been dismissed as wanting with respect to identically situated defendants.

Second, the Court could unilaterally grant summary judgment to Ledkins, Ms. Ledkins and McDonald on Counts I through IV, notwithstanding their failure to request such relief via motion, on the same grounds on which it dismissed Counts I through IV as against Rogers and Fuller.  In general, federal courts are loath to make a party's arguments for it or to dismiss claims of their own accord without affording plaintiffs an adequate advance opportunity to be heard.  Nonetheless, a district court may award summary judgment *sua sponte* so long as the party adversely affected has received adequate notice to submit evidence and arguments on the issue in

question.  *See Flood v. Young Woman's Christian Ass'n of Brunswick, Georgia, Inc.*, 398 F.3d 1261, 1267 (11th Cir. 2005) ("district court may enter summary judgment *sua sponte* if the parties are given adequate notice that they must present all of their evidence"); *Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 n.10 (11th Cir. 2003) ("Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show no material dispute of fact exists...."); *Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999) (similar). Thus, entry of summary judgment on the Court's own motion is appropriate if (1) the legal issue has been fully developed, and (2) the evidentiary record is complete.  *See Artistic*, 331 F.3d at 1202.  This is just such a case.  The Court finds that the legal issue of the viability of Counts I through IV has been fully developed, that the evidentiary record is complete, and that the Hoseas have had a full opportunity to present all of their evidence and legal arguments in support of the existence of a conspiracy between the Sheriff's Defendants and the private defendants, and in support of the alleged invidious discriminatory intent animating defendants' deprivation of plaintiffs' rights.[87]  Accordingly, this is one of the rare cases where *sua sponte* summary judgment is authorized and appropriate.

    In responding to the other defendants' Rule 56 motions, plaintiffs have been unable to show an understanding or willful participation by the private defendants and Sheriff's Defendants in a scheme to relieve plaintiffs of their personal property in an unconstitutional manner.  That shortcoming defeats the § 1983 and § 1985(3) claims against Ledkins, Ms.

---

[87]    In this regard, the Court emphasizes that Counts I through IV against Ledkins, Ms. Ledkins and McDonald are legally and factually indistinguishable from Counts I through IV against Rogers and Fuller.  Both require a showing of a conspiracy between the private defendants and Sheriff's Defendants to deprive the Hoseas of their constitutional rights.  Both require a showing of discriminatory intent in carrying out the deprivation.  Rogers and Fuller, who are identically situated to the other private defendants for purposes of Counts I through IV, specifically sought summary judgment on grounds of no conspiracy and no race discrimination, thereby placing plaintiffs on notice of their need to shoot all the arrows in their quiver on those points.  In presenting evidence and argument on Counts I through IV with respect to Rogers and Fuller, the Hoseas necessarily presented their evidence and argument on Counts I through IV with respect to Ledkins, Ms. Ledkins and McDonald.

Ledkins and McDonald.  Additionally, plaintiffs have been unable to offer evidence that the deprivation of Hoseas' property was motivated by invidious class-based discrimination, as necessary to sustain plaintiffs' § 1982 and § 1985(3) claims against Ledkins, Ms. Ledkins and McDonald.  In light of these demonstrated inadequacies in Counts I through IV, and pursuant to the Court's conclusion that plaintiffs have had adequate notice and fair opportunity to present all arguments and evidence deemed appropriate in support of Counts I through IV, the Court *sua sponte* enters summary judgment in favor of defendants Ledkins, Ms. Ledkins and McDonald as to the federal causes of action set forth at Counts I through IV.[88]

### B. Jurisdictional Status of Litigation.

In light of this development, all federal causes of action have been dismissed as to all defendants.  The only remaining claims are the Alabama claims of conversion and theft, against defendants Rogers, Fuller, Ledkins, Ms. Ledkins and McDonald.  The dismissal of all federal claims has important jurisdictional implications in this case, where subject matter jurisdiction was predicated exclusively on federal question jurisdiction pursuant to 28 U.S.C. § 1331.

Once all triable claims within a federal court's original jurisdiction have been dismissed, the decision of whether to continue to exercise supplemental jurisdiction over the state law claims rests in the Court's discretion.  *See* 28 U.S.C. § 1367(c)(2); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1185 (11th Cir. 2003) (in deciding how to exercise § 1367(c) discretion, court should consider principles of economy, convenience, fairness, and comity); *Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994) (similar).[89]  The

---

[88]     In so doing, the Court expresses no opinion as to the viability of plaintiffs' state-law claims against these defendants for conversion and theft of the Hoseas' personal property. Certainly, plaintiffs have proffered substantial evidence that Ledkins and McDonald were present and heavily involved in the removal and destruction of plaintiffs' belongings on September 24, 2002.  That evidence would seem to create genuine issues of material fact as to those two defendants' potential liability on Counts V and VI.  Because Ms. Ledkins never asked for summary judgment on the state law claims, plaintiffs had no occasion to present any evidence they might have to support her involvement in the conversion and theft.  Without giving plaintiffs advance notice that this claim was at issue for Rule 56 purposes, it would be inappropriate to enter summary judgment in Ms. Ledkins' favor on this basis.

[89]     Judges in this District have routinely declined supplemental jurisdiction in such circumstances.  *See*, *e.g.*, *Powers v. CSX Transportation, Inc.*, 188 F. Supp.2d 857, 869 (S.D.

Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."  *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004).

This approach is buttressed by the bedrock notion that state courts should generally be the final arbiters of state law claims, particularly when federal claims are dismissed before trial. Indeed, the Supreme Court has declared that:

> "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."

*United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (noting that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims") (citation omitted); *Baggett v. First National Bank of Gainesville*, 117 F.3d 1342, 1353 (11th Cir. 1997) (indicating that state courts should be final arbiters of state law and that when federal law claims are dismissed prior to trial, remaining state law claims are best

---

Ala. 2002) (Vollmer, J.) (remanding supplemental state law claims after dismissing federal claims on summary judgment); *Bowens v. City of Atmore*, 171 F. Supp.2d 1244, 1260 (S.D. Ala. 2001) (Butler, J.) ("Because all federal claims have been dismissed prior to trial, because state court should be the final arbiter of plaintiffs' tort claims, and because no countervailing considerations outweigh these circumstances, the plaintiffs' state law claims ... will be dismissed without prejudice."); *Kvalheim v. Checkfree Corp.*, 2000 U.S. Dist. LEXIS 1959, *13 (S.D. Ala. Feb. 17, 2000) (Vollmer, J.) (after granting summary judgment on federal FCRA claim, declining to exercise supplemental jurisdiction to resolve state law invasion of privacy claim); *LeFlore v. Sea Breeze Nursing Home and Rehabilitation Center, Inc.*, 2000 U.S. Dist. LEXIS 8872, *18-19 (S.D. Ala. Jan. 21, 2000) (Howard, J.) (similar); *White v. QMS, Inc.*, 1999 U.S. Dist. LEXIS 20503, *13 (S.D. Ala. Dec. 1, 1999) (Howard, J.) (similar); *Brewer v. City of Daphne*, 111 F. Supp.2d 1299, 1320 (S.D. Ala. 1999) (Steele, M.J.) (upon dismissing federal claim on summary judgment, "[t]he Court declines supplemental jurisdiction of the remaining claim for wrongful death under state law in light of the insubstantial nature of the federal claims"); *Banks v. Debellis*, 1998 U.S. Dist. LEXIS 9632, *8-9 (S.D. Ala. Apr. 22, 1998) (Cassady, M.J.) (recommending dismissal of supplemental state law claims based on considerations of judicial economy, convenience, fairness and comity); *see also Reynolds v. Golden Corral Corp.*, 106 F.Supp.2d 1243, 1255 (M.D. Ala. 1999) (declining supplemental jurisdiction over state law claims after granting summary judgment on federal claims).

resolved by state courts under considerations of judicial economy, fairness, convenience and comity); *Eubanks v. Gerwen*, 40 F.3d 1157, 1162 (11th Cir. 1994) (suggesting that because federal claims were dismissed at summary judgment stage, district court should consider whether interests of comity warrant dismissing state law claim without prejudice).

The only remaining claims for trial are state law claims for conversion and theft.  To resolve those claims, the Court would need to apply and interpret Alabama law concerning, *inter alia*, private property rights in order to ascertain whether the Hoseas had any right of ownership in the personal property at issue in this case as of September 24, 2002.  The Court would need to consider such potentially esoteric questions of Alabama law as whether Judge Drinkard's Order of November 27, 2001, the Hoseas' ensuing refusal to leave, and their failure to make any attempt to retrieve their personal items for a period of eight months following their eviction had any impact on plaintiffs' property rights under state law.  Considerations of comity, fairness, and judicial economy strongly militate in favor of having Alabama courts, rather than federal courts, apply Alabama state law to resolve these issues.  Those considerations are not outweighed by any incremental convenience benefit to the parties in continuing to litigate in this forum. Accordingly, because the federal claims for trial have been dismissed, and after careful consideration of the factors identified in *Shotz*, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses those claims without prejudice. *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.").[90]

_____

[90]    This case originated in federal court; therefore, the Court will dismiss the state law claims, rather than remanding them to state court.  *Cf. Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1123 (11th Cir. 2005) ("Because this case was originally filed in state court and removed to federal court pursuant to 28 U.S.C. § 1441, if the district court declines to continue to exercise supplemental jurisdiction, Cook's remaining claim should be remanded to state court.").  This dismissal in no way prejudices plaintiffs, inasmuch as their claims in Counts V and VI are subject to a six-year limitations period.  *See* Ala. Code § 6-2-34(3) (assigning a six-year limitations period to actions for detention or conversion of personal

**VIII.   Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.      Defendants' Joint Motion to Strike (doc. 110) is **granted in part** and **denied in part**.  The Joint Motion is **granted** as to the Declaration of Bertha Figgers (doc. 104, Exh. B), and that Declaration is **stricken** pursuant to Rule 37(c)(1), Fed.R.Civ.P.  The Joint Motion is **denied** as to the declarations of Phil Ford, Jimmy Figgers and Clyde Grayson.

2.      Defendants' Joint Motion to Strike (doc. 112) Plaintiff's Exhibit C (photographs) is **denied**.

3.      Defendants' Joint Motion to Strike (doc. 113) Plaintiff's Exhibit F (newspaper article) is **denied**.

4.      Defendants' fourth Joint Motion to Strike (doc. 114) is **granted in part** and **denied in part**.  The Motion is **granted** as to the following sections of the Declaration of Mollie Hosea: (a) the second, third and fifth sentences of Paragraph 2; (b) the reference in the second Paragraph 4 to plaintiffs being arrested for trying to stop the burning and taking of their property; and (c) the references to 200 ducks and 30 donkeys in Paragraph 5.  Those portions of plaintiffs' Exhibit P (doc. 105) are **stricken** pursuant to the "sham affidavit" rule. In all other respects, the Joint Motion is **denied**.

5.      The Motion for Summary Judgment filed by defendants Langley, Reese, Jones and Lawrence (doc. 81) is **granted**, and Counts I through IV of the Complaint are **dismissed with prejudice** as to those defendants.

6.      The Motion for Summary Judgment filed by defendants Rogers and Fuller (doc. 92) is **granted in part** and **denied in part**.  The Motion is **granted** as to Counts I through IV of the Complaint, and those claims are **dismissed with prejudice** as to Rogers and Fuller.  The Motion is **denied** as to Counts V and VI.

7.      The Court *sua sponte* enters summary judgment in favor of defendants Ledkins,

_____

property).

Ms. Ledkins and McDonald as to Counts I through IV of the Complaint, and those claims are **dismissed with prejudice** as to those defendants.

8. All remaining claims in this action are state law claims (Counts V and VI) as to non-diverse defendants Rogers, Fuller, Ledkins, Ms. Ledkins and McDonald. The Court **declines** to exercise supplemental jurisdiction over those causes of action and **dismisses** them **without prejudice** to enable plaintiffs to refile those claims in Alabama state court.

9. Because these rulings dispose of all claims against all defendants in this matter, the Clerk's Office is directed to close this file.  A separate judgment will enter.

DONE and ORDERED this 7th day of February, 2006.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE